2000 ME 130

**HILLTOP COMMUNITY SPORTS CENTER, INC.**

v.

**Michael A. HOFFMAN et al.**

Supreme Judicial Court of Maine.

Argued May 1, 2000.
Decided July 5, 2000.

Coleman G. Coyne, Jr., Esq. (orally), Paul Murphy, Esq., Murphy & Coyne, Lewiston, for the plaintiff.

John W. Conway, Esq. (orally), Linnell, Choate & Webber, Auburn, for the defendants.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Randall and Karen Morin appeal from a judgment entered in the Superior Court (Androscoggin County, *Atwood J.*) affirming a deficiency judgment entered in the District Court (Lewiston, *Gorman, J.*) in favor of Hilltop Community Sports Center, Inc. in the amount of $17,298. The judgment reflects the amount owed, as evidenced by a promissory note, after the personal property securing the note had been sold and the proceeds applied to the debt. The Morins argue that because Hilltop failed to give them proper notice of the sale of the property, the trial court erred in allowing Hilltop to recover any deficiency. We discern no error and affirm the judgment.

[¶ 2] On March 1, 1996, Randall and Karen Morin, along with their business partners Michael and Linda Hoffman, purchased athletic and exercise equipment and a customer list for their health and fitness center from Hilltop, and they gave Hilltop a promissory note to evidence their debt and executed a security agreement to secure the debt. Shortly thereafter, the Morins sold their interest in the fitness center to Joseph Daniel Sullivan Jr., but they never obtained from Hilltop any release from their obligations under the promissory note and security agreement. Payments were made on the obligations for only six months, at which point Sullivan and the Hoffmans defaulted, with $37,098 still owing to Hilltop.

[¶ 3] Hilltop filed a complaint in the District Court, and in April of 1997, Hilltop was granted possession of the personal property that was the subject of the security agreement. The court ordered Hilltop "to sell the collateral at public or private sale as soon as practical and to give notice to *the debtors of any intended disposition.*"

[¶ 4] On April 25, 1997, Hilltop notified the Morins that it would "sell the collateral at private sale after May 8, 1997." Between April 25 and May 8, the Morins did nothing to redeem the collateral. On May 1, however, prior to the date specified in the notice, Hilltop entered into an agreement with Andy Valley Racquet Club, Inc.

[¶ 5] On May 1, Paul Gosselin, attorney for Andy Valley Racquet Club, delivered a letter to Paul Murphy, attorney for Hilltop, outlining the terms of an agreement to purchase the collateral:

> Enclosed are the originals of the Asset Purchase and Sale Agreement and Bill of Sale which have been executed by [Andy Valley Racquet Club] in duplicate. Also enclosed are our checks in the total amount of $17,500. These checks are tendered to you on the understanding and condition that they will be held in escrow and not released to your clients until the following have occurred:
>
> . . . .
>
> 3. You have delivered an executed original of the Purchase and Sale Agreement and Bill of Sale; and
>
> 4. You have complied with all other terms and conditions of the Purchase and Sale Agreement.
>
> . . . .
>
> In the event that the above conditions are not complied with on or before May 15, 1997, you will return my client's checks and our clients will retain all rights and remedies against each other.

Murphy signed the letter indicating that he agreed to its terms.

[¶ 6] Also on May 1, the parties signed a bill of sale which stated that Hilltop, for consideration paid, "does hereby grant, sell, transfer and deliver unto **ANDY VALLEY RACQUET CLUB, INC.**, all of its right, title and interest in and to the following goods." Attached to the document were two exhibits listing the property to be conveyed, and at the bottom of the document, the following notation appeared: "Signed, Sealed and Delivered in presence of Paul Murphy [/s/]."

[¶ 7] Accompanying the bill of sale and the letter were two checks and a purchase and sale agreement. One check was in the amount of $1000 and the other was for $16,500. The purchase and sale agreement read, in part, as follows:

> **AGREEMENT** made this 1st day of May, 1997, by and between [Hilltop and Andy Valley Racquet Club] . . . .
>
> . . . .
>
> **NOW THEREFORE**, in consideration of the promises and covenants contained herein, it is hereby agreed as follows:
>
> 1. *Sale of Assets:* The Seller agrees to sell, assign and transfer to the Buyer on the closing date stated herein and the Buyer agrees to buy from the Seller all of the assets described [in the accompanying exhibits]. The Sale will be free of all debts, claims, security interests or liabilities other than the potential claim of Randall Morin, Karen Morin, Michael Hoffman and Linda Morin . . . .
>
> . . . .
>
> 3. *Payment of Purchase Price:* Buyer will pay the purchase price in the following manner.
>
> A. A down payment of $1,500 upon execution of this Agreement . . . . Said down payment shall be a non-refundable deposit, however, it will be applied as part payment toward the purchase payment. The balance of $16,000.00 shall be payable at closing.
>
> 4. *Closing Date:* The purchase of the assets shall take place at the offices of Murphy & Coyne ... not later than fourteen (14) days from the date of this

Agreement, unless extended in writing by the parties.

5. **_Conditions:_** This Agreement is pursuant to and subject to the Order of the Eighth District Court dated April 8, 1997 a copy of which is attached hereto and incorporated herein and further subject to notification to the debtors described therein of sale and any valid objections then may be raised prior to such sale by said debtors.

[¶ 8] After the sale was complete, Hilltop sought a judgment against the Morins for the amount still owed on the promissory note. The Morins challenged the sale, arguing that the notice they had received stating that the sale would take place after May 8, 1997, was deficient because the sale actually occurred on May 1, 1997. Hilltop asserted that, though the agreement was entered into on May 1, the sale did not occur until May 9. The District Court held two hearings to establish whether the notice provided to the Morins was sufficient.

[¶ 9] At the second hearing on September 15, 1998, Attorney Gosselin testified that on May 1 he simultaneously delivered to Attorney Murphy the letter, the purchase and sale agreement, the bill of sale, and the two checks. Gosselin also testified that he included both checks because the sale was contentious and Murphy had required that there be "cash on the table." To protect his clients, however, Gosselin intended that the money be held in escrow until the conditions outlined in the letter had been complied with.

[¶ 10] When Gosselin delivered the documents on May 1, he did not believe that the transaction was complete. On May 9, Gosselin received the releases required by the purchase and sale agreement, as well as a signed purchase and sale agreement and a signed bill of sale from Hilltop.

[¶ 11] Jane Brainerd, co-owner of Hilltop, also testified at the hearing. She signed the purchase and sale agreement and the bill of sale on May 1, but she did not receive any money at that time. On May 9, Brainerd received the checks from Attorney Murphy and deposited them in the bank.

[¶ 12] Based on the terms of the written agreement and the extrinsic evidence offered by Hilltop, the District Court found that the sale had occurred on May 9, 1997, and that Hilltop had given the Morins sufficient notice of the sale. Following an unsuccessful appeal to the Superior Court, the Morins filed this appeal.

I.

[¶ 13] In contending that the notice they received was inadequate, the Morins maintain that the bill of sale, dated May 1 and signed by both parties, is an integrated agreement and that the court erred by admitting parol evidence and by concluding that the date of sale was May 9. The court concluded that the purchase and sale agreement, along with the letter, are part of the written agreement and considered them in construing the agreement. Because the written agreement is ambiguous with respect to the date on which the sale would become final, the trial court considered the testimony of both Gosselin and Brainerd to ascertain the intent of the parties with respect to the date on which the sale became final, and it concluded that the sale became final on May 9.

[¶ 14] "When the Superior Court acts as an intermediate appellate court, we directly review the decision of the District Court." _Bangor Publ'g Co. v. Union St. Market_, 1998 ME 37, ¶ 5, 706 A.2d 595, 597.

[¶ 15] At the trial, Hilltop had the burden of establishing, as a condition precedent for obtaining a deficiency judgment, that it provided proper notification to the Morins, pursuant to 11 M.R.S.A. § 9–504(3) (1995).[1] _See Camden Nat'l Bank v._

---

1. Title 11, section 9–504(3) provides, in part: Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on

*St. Clair*, 309 A.2d 329, 333 (Me.1973). We have stated

> that the reasons for requiring a creditor to give the defaulting debtor notice of the impending disposition of the collateral are to afford the debtor an opportunity to discharge the debt and redeem the collateral, produce another purchaser, or see that the sale is conducted in a commercially reasonable manner. Any aspect of a sale notice contrary to these purposes necessarily prevents it from being a reasonable notification.

*Peoples Heritage Sav. Bank v. Theriault*, 670 A.2d 1391, 1393 (Me.1996) (citations omitted).

### A. The Documents Included in the Written Agreement

[¶ 16] "The general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purposes, and in the course of the same transaction will be considered and construed together, since they are, in the eyes of the law, *one contract or instrument.*"

*Kandlis v. Huotari*, 678 A.2d 41, 43 (Me. 1996) (quoting 17A Am. Jur.2d *Contracts* § 388 (1991)), *quoted in Bumila v. Keiser Homes of Me., Inc.*, 1997 ME 139, ¶ 12, 696 A.2d 1091, 1094. Extrinsic evidence may be offered to prove that separate writings should be read together as a single transaction. *See Kandlis v. Huotari*, 678 A.2d at 43 (relying, in part, on affidavits to conclude that guarantee agreements signed by several shareholders during a two week period were part of the same transaction).

[¶ 17] Here, contrary to the contentions of the Morins, the bill of sale cannot be read in isolation. The purchase and sale agreement, the letter, and the bill of sale, executed at the same time by the same contracting parties, for the same purpose, in the course of the same transaction, and in the absence of contrary intention, should be considered and construed together because they are, in the eyes of the law, one contract or instrument. *See Kandlis v. Huotari*, 678 A.2d at 43; *see also Rosenthal v. Means*, 388 A.2d 113, 115 (Me.1978).

[¶ 18] Both the language of the purchase and sale agreement and the letter make it clear the written agreement consisted of those documents and the bill of sale. Moreover, the court found that there was "no dispute **between the parties** [to the sale] but that the conditions listed in Attorney Gosselin's letter were part of the agreement between these parties." That factual finding is not clearly erroneous, supported as it is by testimony that the letter was delivered together with the other documents and that the attorney for Andy Valley Racquet Club intended and believed that the letter was part of the agreement. The finding is further supported by Jane Brainerd's testimony that she was aware of the conditions imposed by the Gosselin letter and that she agreed to them. Accordingly, the District Court committed no error in considering all of the written documents as parts of a single agreement.

### B. Construction of the Written Agreement

[¶ 19] It must be determined whether the agreement, comprised as it is of the several documents, is ambiguous,

---

any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time

and place of any public sale or *reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor.*
11 M.R.S.A. § 9–504(3) (1995) (emphasis added).

especially with respect to the date the sale was to be finalized. *See Spottiswoode v. Levine*, 1999 ME 79, ¶ 16, 730 A.2d 166, 172. Whether a term in a contract is ambiguous is an issue of law. *See id.* A contract is ambiguous if it is reasonably susceptible to more than one interpretation. *See Fitzgerald v. Gamester*, 658 A.2d 1065, 1069 (Me.1995).

[¶ 20] Here, the bill of sale acknowledges "receipt and delivery" of the property on May 1, yet the purchase and sale agreement does not define a closing date, simply stating that the purchase "shall take place . . . not later than fourteen (14) days from the date of this Agreement." Moreover, the letter from Attorney Gosselin notes that certain conditions have to be met before the sale is to be completed. Given the conflicting statements in the written documents, it is clear that the agreement is ambiguous with respect to the date the sale was to be finalized.

 [¶ 21] When a written agreement is ambiguous, the court must determine the intent of the parties in entering that contract, and that determination is a question of fact that we review for clear error. *See Spottiswoode v. Levine*, 1999 ME 79, ¶ 16, 730 A.2d at 172; *see also Bangor Publ'g Co. v. Union St. Market*, 1998 ME 37, ¶ 5, 706 A.2d 595, 597. To aid it in construing the agreement, "the factfinder may 'entertain extrinsic evidence casting light upon the intention of the parties with respect to the meaning of the unclear language.'" *Bangor Publ'g Co. v. Union St. Market*, 1998 ME 37, ¶ 5, 706 A.2d at 597 (quoting *T–M Oil Co., Inc. v. Pasquale*, 388 A.2d 82, 85 (Me.1978)). Accordingly, it was appropriate for the court to accept extrinsic evidence to aid it in determining the date on which the parties intended the sale to be finalized.[2] *See Bangor Publ'g Co. v. Union St. Market*, 1998 ME 37, ¶ 6, 706 A.2d at 597.

 [¶ 22] The court heard evidence that Gosselin and Brainerd both understood and intended that the sale would not be complete until the conditions in Gosselin's letter had been satisfied. Moreover, Brainerd also testified that she did not receive and deposit any money until May 9. Finally, Gosselin testified that he did not receive the signed bill of sale and the signed purchase and sale agreement from Hilltop until May 9. Given this evidence and the language contained in the written agreement itself, the court's finding that the sale did not take place until May 9 is supported by the evidence and is not clearly erroneous.[3]

2. Because the written agreement is ambiguous with respect to the date the sale was to be finalized, we do not address the Morins' argument that extrinsic evidence was barred by the parol evidence rule because that rule applies only when extrinsic evidence is "offered to alter, augment, or contradict the *unambiguous* language of an integrated written agreement." *See Handy Boat Serv., Inc. v. Professional Servs., Inc.*, 1998 ME 134, ¶ 11, 711 A.2d 1306, 1308–09 (emphasis added).

3. The Morins also argue that Attorney Murphy was acting as an agent for Hilltop and not as an escrow agent on May 1 when Attorney Gosselin delivered the checks, the signed purchase and sale agreement, and the bill of sale on behalf of Andy Valley Racquet Club. They contend that because Murphy was Hilltop's agent, the sale was complete upon delivery of the signed documents. That argument fails for two reasons. First, an attorney for one party can act as an escrow agent in a transaction between his principal and another party, as long as his escrow role " 'involves no violation of duty to the principal and the person acts *as an individual and not as an agent.*'" *See Progressive Iron Works Realty Corp. v. Eastern Milling Co.*, 155 Me. 16, 19, 150 A.2d 760, 762 (1959) (quoting 30 C.J.S. *Escrows* § 7d). In making this determination, it is "the intention of the parties at the time of deposit [that] is controlling," *see Progressive Iron Works Realty Corp. v. Eastern Milling Co.*, 155 Me. at 20, 150 A.2d at 762, and in this case the trial court's findings support the conclusion that Attorney Murphy properly acted as an escrow agent in this case. Second, even if Attorney Murphy acted solely as agent for Hilltop, the delivery of documents by Andy Valley Racquet Club did not operate to finalize the sale. Because the agreement called for the sale to be completed only after certain conditions were met, the sale was not finalized until those conditions were met and the documents were signed and delivered.