# United States Court of Appeals
## For the First Circuit

No. 02-2601

BYRON A. CROWE,

Plaintiff, Appellee,

v.

J.P. BOLDUC,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. David M. Cohen, U.S. Magistrate Judge]

Before

Lynch, Circuit Judge,
R. Arnold[*], Senior Circuit Judge, and
Howard, Circuit Judge.

Jennifer D. Sawyer, with whom were John M.R. Paterson and Bernstein, Shur, Sawyer & Nelson, on brief for appellee.

Lee H. Bals, with whom were Michael J. Gartland and Marcus, Clegg & Mistretta, P.A., on brief for appellant.

July 3, 2003

[*] Of the Eighth Circuit, sitting by designation.

**LYNCH**, **Circuit Judge**. A jury held that J.P. Bolduc was liable for close to $100,000 in attorneys' fees and costs incurred by Byron Crowe in a third-party lawsuit arising out of Bolduc's acquisition of the assets of Crowe's business, the Crowe Rope Company, and some other property.

Two basic arguments are urged on appeal. The first issue is whether the trial judge erred by excluding evidence and whether Bolduc is entitled to a new trial. Two rationales used to exclude the evidence -- which amount to the proposition that witnesses who are lawyers are not to be subjected to cross-examination for bias as other witnesses are -- are plainly erroneous, and we specifically disapprove of them. But there was another rationale for exclusion which withstands review, so Bolduc is not entitled to a new trial on that ground. The second issue, actually a series of sub-issues, concerns the interpretation of the agreement. We sustain the jury verdict. This case contains cautionary tales and lessons about trial practice.

The case grew out of an earlier litigation in which Crowe successfully defended a suit by a trade creditor of Crowe Rope seeking to seize certain annuity payments due to Crowe under the agreements with Bolduc. Achille Bayart & Cie v. Crowe, 238 F.3d 44, 46 (1st Cir. 2001). After his successful defense, Crowe sought to recover his costs and legal fees from Bolduc pursuant to the

agreements. Bolduc refused, and Crowe brought suit. <u>Crowe</u> v. <u>Bolduc</u>, 215 F. Supp. 2d 233, 236-37 (D. Me. 2002).

The Magistrate Judge who heard the case made two rulings challenged here. First, on a pre-trial motion in limine, he ruled that the two attorneys called as witnesses by Crowe to testify to the intent of the agreements could not be cross-examined for bias arising out of their firm's contingent fee agreement in the litigation. Second, he ruled on a motion for summary judgment that the agreements were ambiguous, and so the question of their interpretation should go to the jury, and then he upheld the jury verdict on a subsequent motion for judgment as a matter of law.

## I. Facts

Crowe was the President and sole shareholder of Andrew Crowe & Sons, Inc. d/b/a Crowe Rope Company. It had been one of the major American manufacturers of rope, but had fallen on hard times. As of December 12, 1995, Crowe Rope owed over eight million dollars to Fleet National Bank of Massachusetts.[1] Crowe himself owed an additional $50,223.61 to Fleet Bank, and one other company of which he was the sole shareholder, Portco, Inc., owed another $150,670.83. Crowe Rope was the guarantor of the debts of both Crowe and Portco, either directly or indirectly.

---

[1] The original loan transactions had been with Shawmut National Bank, but shortly before December 1995, Shawmut had been acquired by and merged with Fleet Bank. As a result, Fleet Bank acquired the loans previously held by Shawmut. <u>Achille Bayart</u>, 238 F.3d at 45 n.2.

Bolduc had been the President and CEO of W.R. Grace & Co. and now had a number of business interests. In December 1995, through several holding companies, Bolduc acquired the debt owed by Crowe Rope, Crowe and Portco to Fleet Bank. Bolduc paid Fleet Bank $8.4 million. Subsequently Crowe Rope transferred all of its assets to a Bolduc entity, and Bolduc foreclosed on the real estate, machinery and equipment of Crowe Rope. Achille Bayart, 238 F.3d at 45-46. All of Crowe's personal guarantees were paid by Bolduc, at a cost of over $1 million. Bolduc also agreed to pay a $40,000.00 annuity to Crowe and his wife Ruth in exchange for title to several parcels of real estate owned by the Crowes, some of which had been rented to Crowe Rope.

The Crowes entered into several written agreements with Bolduc, including an agreement dated December 8, 1995 ("the Agreement"), and a letter from Bolduc to the Crowes, also dated December 8, 1995 ("the Letter Agreement"). The Letter Agreement provided that Bolduc and a new corporation to be formed by him would pay the Crowes the sum of $40,000.00 annually, as long as either of them lived, in exchange for the real estate. The Agreement established that Bolduc would pay Crowe $60,000.00 in twelve equal payments over the first year for consulting services and an agreement not to compete with the new corporation for five years. The pertinent text of the two agreements is set forth later.

-4-

The specter of possible litigation by creditors against either Crowe Rope or the Crowes was a dominant concern of the parties. Should the Crowes' annuity be taken in judgment by any court, Bolduc promised to provide an equivalent substitute payment. Bolduc also acknowledged that several such creditor suits were already pending at the time of the agreement. The Letter Agreement required the Crowes to "immediately notify Bolduc, in writing, of any such claim." Bolduc "thereupon shall be entitled to defend such claim, to compromise it or settle it, in his sole judgment, as he may deem appropriate, and at his sole cost and expense." Paragraph 6 of the Agreement described Crowe's obligation to cooperate with any defense mounted by Bolduc.

The transaction, however, made no provision for the payment of any trade creditors of Crowe Rope, and left no assets in Crowe Rope, now an insolvent shell company. These debts amounted to over $4 million. One of these creditors, Achille Bayart & Cie, filed a complaint in federal district court on May 6, 1998 against the Crowes, seeking to collect a debt of $132,287.00 plus double damages ("the Achille Bayart action"). Achille Bayart, 238 F.3d at 46. Achille Bayart brought suit pursuant to the Maine Uniform Fraudulent Transfer Act, Me. Rev. Stat. Ann. tit. 14, §§ 3571-3582 (West 2003), arguing that there remained equity in Crowe Rope over and above the amount paid by Bolduc to Fleet Bank, while unsecured creditors such as Achille Bayart received nothing. Achille Bayart,

-5-

238 F.3d at 46. Achille Bayart sought to avoid the $40,000.00 annuity to the Crowes as a fraudulent transfer. Crowe defended the case. Crowe, 215 F. Supp. 2d at 236-37. The case went to trial in January 2000. At the conclusion of Achille Bayart's case, Crowe moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The court found that there was insufficient evidence to permit a jury to conclude that there was such excess value, and the motion was granted. Achille Bayart, 238 F.3d at 46. Achille Bayart then appealed to this court, which affirmed. Id. at 49.

Crowe then sought to collect $91,477.26 from Bolduc, the legal fees and costs he incurred in defending the Achille Bayart action. Crowe, 215 F. Supp. 2d at 236-37. Crowe's counsel had notified Bolduc of the Achille Bayart action in a letter dated October 28, 1998, five months after Crowe received notice. At that time, Crowe sought to tender defense of the action to Bolduc, but Bolduc refused. Bolduc's counsel cited the immediate-notice provision as the reason for their refusal. Counsel for Crowe had responded to Achille Bayart's complaint, filed interrogatories, and submitted motions to dismiss and stay discovery. The legal fees at that time amounted to approximately $7,000.00. During the course of the Achille Bayart action, Bolduc's counsel did not make any complaints, criticisms or suggestions about the handling of the case. Id. at 236. Crowe forwarded at least one settlement offer made by Achille Bayart to Bolduc, and Achille Bayart independently

approached Bolduc with another settlement offer. Bolduc refused both.

Crowe brought suit against Bolduc in Maine Superior Court, alleging breach of contract and promissory estoppel. Bolduc, a citizen of Maryland, then removed the case to the U.S. District Court for the District of Maine, under U.S.C. 28 §§ 1332, 1441(a) (2000). After discovery, Bolduc moved for summary judgment on both of Crowe's claims, asserting that the contract unambiguously gave Bolduc a right to refuse to defend a suit against Crowe, and that Crowe's promissory estoppel claim was barred by the parol evidence rule. The Magistrate Judge issued a decision on May 6, 2002, recommending that summary judgment be denied with regard to the breach of contract claim and granted with regard to the promissory estoppel claim. The Magistrate Judge's recommendations were adopted, after de novo review, by the District Judge. Crowe, 215 F. Supp. 2d at 234. The case then went to a jury trial, which was heard by consent before the Magistrate Judge.

Before trial, both sides indicated their intention to call as witnesses the lawyers from each of their respective firms who had participated in drafting the agreements. Crowe planned to call Gregory Tselikis and Robert Keach, both of whom are members of Bernstein, Shur, Sawyer & Nelson ("BSS&N"), the firm which represented Crowe in the Bolduc acquisition, the Achille Bayart action and the instant suit against Bolduc. Bolduc intended to

call George Marcus and Jennie Clegg, both of whom are members of the same firm as Bolduc's trial counsel, Marcus, Clegg & Mistretta.[2] At a pre-trial conference, Crowe requested that the trial court prohibit cross-examination of Tselikis and Keach regarding BSS&N's fee arrangement with Crowe. BSS&N was representing Crowe in this case on a contingent fee basis. The Magistrate Judge granted Crowe's request in an oral in limine order issued on September 13, 2002.

At trial, Bolduc moved twice for judgment as a matter of law under Rule 50(a); both motions were denied. The jury found in Crowe's favor, and he was awarded a judgment in the amount of $86,381.98. Bolduc then moved for judgment as a matter of law under Rule 50(b). He asserted that the contract was unambiguous as a matter of law, and that no reasonable jury could conclude that the failure to give notice was not a material breach of the contract. This motion, too, was denied. Bolduc now appeals the decision in the motion in limine order and the denials of his motions for judgment as a matter of law.

---

[2] George Marcus was the only member of his firm to actually testify at trial. At the time the agreements were drafted, Marcus worked at a different law firm, Pierce Atwood, but subsequently formed Marcus, Griegel & Clegg (which later became Marcus, Clegg & Mistretta). Bolduc came with Marcus as a client when Marcus left Pierce Atwood.

## II. Motion in Limine

The appeal from the exclusion of evidence by motion in limine raises a number of issues of practical significance to the bar and trial courts.

Bolduc argues that the Magistrate Judge, as the trial judge, committed errors of law and abused his discretion in limiting Bolduc's counsel in their opening argument and in their cross-examination of attorneys Keach and Tselikis, both witnesses and shareholders of BSS&N. Specifically, the judge ordered Bolduc's counsel to refrain from mentioning that Keach and Tselikis had a financial interest in the outcome of the action as a result of BSS&N's contingent fee agreement with Crowe in this case. Part of Bolduc's intended cross-examination concerned the failure of the lawyers at BSS&N to give timely notice of the Achille Bayart action to Bolduc, and their agreement to represent Crowe on a contingent basis to atone for their error. Bolduc also argued that the information tended to show that BSS&N might be sued by Crowe over the failure to give notice if the suit turned out badly for Crowe, thus maximizing the financial incentives involved for the two witnesses.

At trial, the two BSS&N attorneys both testified as fact witnesses and gave their opinions as to the intent and meaning of the disputed language in the key agreement documents. Since the court had found the contract to be ambiguous, the jury heard parol

evidence as to the intent and meaning of the pertinent language. See Villas By the Sea Owners Ass'n v. Garrity, 748 A.2d 457, 461 (Me. 2000). Attorney Keach described himself as "a specialist in the area of corporate bankruptcy law and related commercial litigation," had practiced for over twenty years in that field, was chair of the business reorganization committee of the American Bankruptcy Institute and was "one of four Maine attorneys admitted to the American College of Bankruptcy Lawyers." Certainly, the subject matter of his testimony -- interpretation of a contract -- was not a subject commonly addressed by lay witnesses.[3] Keach interpreted the meaning and intent of the language at issue, sentence by sentence. Attorney Tselikis has a similar background and credentials, and he testified to the intent and meaning, section by section, of the key language.

Specifically, Keach and Tselikis testified that the "shall be entitled to defend such claim, to compromise it or settle it" language contained on page two of the Letter Agreement meant that Bolduc was required to defend, compromise or settle the claims asserted in the Achille Bayart action. They also testified that Paragraph 6 of the Agreement required Bolduc to reimburse Crowe for the legal fees, costs and expenses he incurred in defending the Achille Bayart action.

---

[3] We do not suggest either lawyer must have been qualified as an expert, and no claim to that effect is made.

There was contrary testimony from Bolduc and his transaction attorney witness. The attorney witness who handled the transaction for Bolduc was George Marcus, originally at Pierce Atwood at the time of the agreement and then at the same firm as Bolduc's trial counsel. Marcus did not have a contingent fee agreement. The record is silent as to whether he charged for the time spent on his testimony, although trial counsel did inform the court that his firm had an hourly fee arrangement. Bolduc argues that his inability to examine the two BSS&N attorney witnesses for bias, or even to argue bias, was harmful to him and undermined confidence in the verdict. He notes that Crowe's testimony was far weaker than the testimony of his counsel on the intent and meaning of the contract language.

The trial court gave three grounds for its in limine exclusion ruling, two of which were in error. First, the Magistrate Judge found there was no evidence that Keach and Tselikis would color their testimony because of BSS&N's contingent fee agreement with Crowe and their firm's financial interest in the outcome of the case. Second, the Magistrate Judge believed that "unlike all other witnesses testifying, lawyers are officers of the court who, apart from the oath taking, are ethically bound to testify truthfully." Third, the Magistrate Judge concluded that allowing the parties to cross-examine the lawyer witnesses about their firm's fee arrangements would "risk causing the jury to be

-11-

confused as to what the real issues in the case [were]." The court was "satisfied that the probative value of such fee related evidence [was] substantially outweighed by this danger of confusion." Apparently, the court felt that the use of an attorneys' fee agreement to show bias on the part of Crowe's witnesses would confuse the jury on the question of whether a different agreement required the payment of Crowe's legal fees by Bolduc. Accordingly, the court excluded the evidence under Federal Rule of Evidence 403.

As to the first two grounds, we believe the trial court committed errors of law. The trial court, on the first ground, imposed a burden on the cross-examiner to show some evidence that a witness might color his testimony due to financial incentives before permitting cross-examination on the fact that the witness had financial incentives to do exactly that. The offered evidence is, of course, classic evidence of bias, which is routinely permitted on cross-examination. Wheeler v. United States, 351 F.2d 946, 947 (1st Cir. 1965) (finding it is "clear that inquiry into the possible financial stake of a witness in a particular outcome of a case in which the witness is testifying is a proper subject for cross-examination").

The problem was exacerbated here because the witnesses, admittedly not called as experts, gave what amounted to opinion testimony as to the meaning of the contract language. The majority

rule in this country is that an expert witness may not collect compensation which by agreement was contingent on the outcome of a controversy. That rule was adopted precisely to avoid even potential bias. New Eng. Tel. & Tel. Co. v. Bd. of Assessors, 468 N.E.2d 263, 265, 267 (Mass. 1984); see Accrued Fin. Servs., Inc. v. Prime Retail, Inc., 298 F.3d 291, 300 (4th Cir. 2002). Maine enforces this policy in part by a Bar Rule which prohibits the hiring of witnesses on a contingent fee basis. Maine Bar Rule 3.7(g)(3).

The issue before us is not whether the lawyers should have been permitted to testify at all. Bolduc did not seek to exclude the testimony of Crowe's attorney witnesses, but sought only to be able to examine them for bias. The issue, then, is whether a restriction on cross-examination for bias as evidenced by a contingent fee agreement on the ground that the witnesses are attorneys is appropriate. The trial court mistook this issue of cross-examination for bias for the issue of whether the Maine Bar Code permitted the attorneys to testify at all. Where witnesses under contingent fee agreements are permitted to testify, examination on the contingent fee is considered vital. See United States v. Valona, 834 F.2d 1334, 1343 (7th Cir. 1987) ("Other circuits do not consider any type of witness contingent fee arrangement outrageous and instead allow the jury to consider the fee arrangement in its evaluation of witness credibility.")

-13-

(collecting cases).  <u>See generally</u> Note, <u>Contingent Fees for Expert Witnesses in Civil Litigation</u>, 86 Yale L.J. 1680 (1977).

The First Circuit considered the interaction between permitted testimony of a witness paid on a contingent fee basis and opportunity to cross-examine in <u>United States</u> v. <u>Cresta</u>, 825 F.2d 538 (1st Cir. 1987).  This court held in that criminal case that the district court did not commit reversible error by declining to exclude the (non-expert) testimony of any informant apparently paid on a contingent basis.  <u>Id</u>. at 545.  Part of the trade-off, the court explained, was that there would be vigorous cross-examination for bias:

> A contingent fee arrangement is not per se impermissible; on a case by case basis, varying factors determine whether the arrangement in question is permissible. . . .
> . . . . While the risk of perjury is recognized, courts have chosen to rely upon cross-examination to ferret out any false testimony.  Rather than adopting an exclusionary rule, courts have chosen to leave the matter to the jury to consider in weighing the credibility of the informant.
> There are established safeguards that must be followed to ensure the veracity of the witness: the jury must be informed of the exact nature of the contingency agreement; the defense counsel must be permitted to cross-examine the witness about the agreement; and the jury must be specifically instructed to weigh the witness' testimony with care.

<u>Id.</u> at 545-46 (citation omitted); <u>see</u> <u>United States</u> v. <u>Gonzalez-Vazquez</u>, 219 F.3d 37, 46 (1st Cir. 2000) (quoting <u>Cresta</u>, 825 F.2d at 546).

The second ground for exclusion relied on by the trial court is also flawed. The court held that because attorneys are officers of the court and "are ethically bound to testify truthfully," there was a basis to preclude cross-examination for bias. Witnesses who are attorneys may not be protected by special dispensation from the normal rigors of cross-examination. Such a rule of favor, as adopted by the trial court, would undermine compliance by attorneys with their obligations.

Further, it was the province of the jury, not the court, to evaluate the credibility of the witnesses. See Blake v. Pellegrino, 329 F.3d 43, 47 (1st Cir. 2003) (finding that the judge cannot substitute his own judgment for that of the jury in assessing the persuasiveness of evidence). That the court has a high opinion of attorneys in general, or even of particular attorneys, does not justify the court's substituting its judgment as to the veracity of those attorney witnesses for the judgment of the jury.

There is a question as to whether our standard of review for the in limine exclusion should be for abuse of discretion or for plain error. Our rule as to motions in limine is that a party must renew at trial its motion to offer or exclude evidence if there has been an earlier provisional ruling by motion in limine and a clear invitation to offer evidence at trial. United States v. Holmquist, 36 F.3d 154, 166 (1st Cir. 1994). If, by contrast,

-15-

the in limine ruling is final and unconditional, the issue was preserved for appeal and no further steps need be taken to preserve the issue. <u>Fusco</u> v. <u>General Motors Corp.</u>, 11 F.3d 259, 262-63 (1st Cir. 1993). Here there was no attempt at trial to introduce the evidence which was the subject of the in limine exclusion. Our circuit rule has now been codified in a 2000 amendment to Rule 103, Federal Rules of Evidence. The Rule provides in part: "Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(a).

As the commentary to the Rule makes clear: "The amendment imposes an obligation on counsel to clarify whether an in limine or other evidentiary ruling is definitive when there is doubt on that point." Fed. R. Evid. 103 advisory committee's note, 2000 Amendment. Unfortunately, the trial court left doubt on the point in its ruling:

> And, if you feel at any point during the trial that despite this ruling, which is in the nature of an in limine ruling and is therefore by definition tentative, if you feel that you have an argument based on the circumstances of the record as it has developed to press again this issue, then you may do so, of course, but at sidebar. In other words, you are not to be asking any questions of witnesses in cross-examination that seeks to elicit this kind of information until we address the issue again at sidebar. I'm not inviting you to do that, you understand, but I just want to be clear that obviously if you think there is something significant about the way that the evidence has gone in and has not

-16-

been taken into account by way of analysis, then you can raise it again.

It is not true, as the trial court assumed, that in limine rulings are "by definition tentative." See Black's Law Dictionary 791 (7th ed. 1999) (defining "in limine" as "preliminarily; presented to only the judge, before or during trial"). Some in limine rulings may be final, and whether the ruling is final or tentative has important consequences for counsel. The trial court's ruling can be read either way: that the ruling was only tentative, or that it was final unless circumstances at trial changed and warranted a new effort to introduce the evidence. Formulations such as the one used by the trial court here are not uncommon but are inadvisable because of the ambiguity created.

The burden, though, was on Bolduc to clarify whether the in limine ruling was final or not, and he did not. However, given the duality of the Magistrate Judge's in limine order, we think it better to grant Bolduc the benefit of an abuse of discretion standard of review on the Rule 403 decision.[4] We discard the two erroneous rationales and focus on the court's ruling that the risk of jury confusion outweighed the benefit from the evidence.

---

[4] Moreover, Crowe's briefs did not raise the issue of Bolduc's failure to preserve his objection. Instead, Crowe argued that an abuse of discretion standard applied on review. It was only upon inquiry from the bench at oral argument that the parties began to address the issue, with subsequent briefing.

Regardless, our decision as to the standard of review does not affect the outcome: under the more stringent plain error standard, we would also reject Bolduc's argument.

-17-

Appellate courts have been very reluctant to second-guess a trial judge's Rule 403 ruling, given the advantages of first-hand observation of the trial.  See United States v. Nelson-Rodriquez, 319 F.3d 12, 34 (1st Cir. 2003).  While we might well have ruled differently on the Rule 403 admissibility question were our review de novo, we cannot say the judgment reached was so out of kilter as to constitute an abuse of discretion.

### III.  Judgment as a Matter of Law

Our review of a denial of a motion for judgment as a matter of law is de novo.  Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 75 (1st Cir. 2001).  "A motion for judgment as a matter of law only may be granted when, after examining the evidence of record and drawing all reasonable inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict."  Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-51 (2000)).  This review is weighted toward preservation of the jury verdict, which stands unless the evidence was so strongly and overwhelmingly inconsistent with the verdict that no reasonable jury could have returned it.  Primus v. Galgano, 329 F.3d 236, 241-42 (1st Cir. 2003).

Bolduc's first argument is that the contract was unambiguous as a matter of law. He contends that the contract entitled Bolduc to do one of three things upon receiving notice of

a suit against Crowe: take up the defense himself and either proceed with the case or settle it; let Crowe continue the defense and reimburse him for his costs; or do nothing. The Magistrate Judge disagreed and rejected Bolduc's summary judgment motion and subsequent motions for judgment as a matter of law on that ground. Contract interpretation on ambiguity, as a matter of law, is subject to de novo review. Mirra Co. v. Sch. Adm. Dist. No. 35, 251 F.3d 301, 304 (1st Cir. 2001); see Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 52-53 (1st Cir. 2001) (applying plenary review to the question of contract ambiguity).

As a preliminary matter, we consider the interaction between this question and Bolduc's second argument, that Crowe's late notice constituted a material breach of the contract. Bolduc's briefs do not clearly set forth the relationship between his notice argument and his argument that the contract is unambiguous in imposing no defense obligation. One might ask why, if Bolduc clearly had no obligation to pay defense costs, there was a contract provision requiring Crowe to give Bolduc immediate written notice of any lawsuit. Bolduc's response would seem to be that he agreed to pay indemnity for any judgment (up to the amount of annuity and the consulting fee) if, and only if, he was given timely notice of the lawsuit and had the chance to choose to defend from the outset. But since the Achille Bayart lawsuit resulted in

no judgment against Crowe, there was nothing to indemnify under this theory and so no notice issue is raised.

If, on the other hand, the late notice/material breach issue does have significance with regard to the issue of ambiguity, as Bolduc professed to the trial court and to us, then its import must be that Bolduc did have an obligation to pay defense costs (which he denied having) subject to his receiving immediate written notice. If so, and if, as the jury determined, there was no material breach, then Bolduc was, on this theory, responsible to pay defense costs. On this second approach, only the material breach issue is important.

Bolduc tries to ride both horses at once.[5] Before the jury, Bolduc emphasized the prejudice from late notice theory. Before this court, Bolduc emphasizes the theory that an unambiguous contract imposed no obligation at all to pay defense costs. While counsel are entitled to present inconsistent theories, there are

_____

[5] An argument to reconcile the two theories could be constructed along these lines: If Bolduc had been given timely notice of the Achille Bayart action, he would either have rejected the defense or accepted. If he rejected the defense, then Crowe should have permitted default judgment to be entered against him, to be paid by Bolduc, and there would be no counsel fees spent on defense. But the argument does not work -- the agreement did not require Crowe to choose not to defend, nor was it in his interest to make a choice not to defend.

If Bolduc intended contingently to argue only that if the jury found the agreement imposed an obligation of defense costs, he could still raise the defense that the obligation was excused by Crowe's late notice, he has not made that clear, and that argument does not go to contract interpretation.

obvious dangers.  Where, in a civil case, the two theories advanced are so intellectually antagonistic that the one necessarily makes the other false, the proponent of the irreconcilable theories runs considerable risks.

In any event, neither horse has legs.  The theory that the contract unambiguously absolved Bolduc from defense costs (save for requested cooperation costs incurred by Crowe) is unpersuasive, and the jury was warranted in adopting Crowe's interpretation.  The theory that the violation of the timely-notice requirement amounted to a material breach was creditably rejected by the jury on the evidence.

A.  Ambiguity

Under Maine law, "a contractual provision is considered ambiguous if it is reasonably possible to give that provision at least two different meanings." Villas By the Sea, 748 A.2d at 461. Ambiguity is to be determined from the perspective of "an ordinary or average person."  Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 34 (1st Cir. 2001) (applying Maine law).  Determination of whether the contract is ambiguous is a question of law for the court.  Golden Rule Ins. Co. v. Atallah, 45 F.3d 512, 516 (1st Cir. 1995) (same).  Contract language is interpreted according to its "generally prevailing meaning." Guilford Trans. Indus. v. Pub. Utils. Comm'n, 746 A.2d 910, 914 (Me. 2000) (quoting Restatement (Second) of Contracts § 202(3)(A)

-21-

(1981)).  "An interpretation that would render any particular provision in the contract meaningless should be avoided." <u>McCarthy</u> v. <u>U.S.I. Corp.</u>, 678 A.2d 48, 52 (Me. 1996).

There were two competing interpretations of the agreements.  Under Crowe's interpretation, Crowe was assured that Bolduc would pay for Crowe's defense and would provide indemnity for any judgment against Crowe from the extremely likely lawsuits filed by the unpaid and unsecured trade creditors of Crowe Rope. This protection was essential to Crowe for another reason as well -- all that Crowe received from the deal was relief from his personal guarantees and an annuity of $40,000.00, plus a one year consulting fee of $60,000.00, and he did not want those funds jeopardized.  From Crowe's point of view, Bolduc had an obligation to pay all of Crowe's defense costs, and Crowe had an obligation to cooperate.  Bolduc also had the option to assume the defense and pay the lawyers directly.  If Bolduc did assume the defense, he could control any settlement of the case; if he did not assume the defense, he could not.  The problem with this interpretation is that Bolduc could easily have thought it against his interest to agree to a defense cost obligation, and some language supports Bolduc's position.

Bolduc's interpretation was that he purchased the bank loans secured by the company's assets, he relieved Crowe of his personal guarantees on the loans, he foreclosed and obtained the

assets (but not the liabilities) of Crowe Rope, he agreed to pay Crowe $40,000.00 yearly as an annuity and a one-time $60,000.00 consulting fee, and the only indemnity he ever provided was as to the annuity and consulting fee. Even the limited indemnity was subject to the requirement of timely notice. As Bolduc testified, "if ultimately I'm going to be held liable to cover that $40,000, I don't want somebody else determining my destiny." On Bolduc's theory, once he was given timely notice, he then could reject the defense of the suit and assume the risk of judgment, or he could accept the defense and pay Crowe his legal fees for any cooperation Bolduc requested of him. In the latter situation, Bolduc would assume control of the defense and defense costs, and would reimburse Crowe only for the costs of his cooperation. In the first situation, on Bolduc's theory, Crowe would have no incentive to incur any counsel fees because Bolduc would pay any judgment.

The problems with this theory, of course, are that it required Crowe to trust that Bolduc would honor his annuity indemnification, and it assumed that Crowe would be willing to risk a judgment for more than the amount of the indemnification by not defending. Still, Bolduc made his interest clear: "if I'm going to pay, I want to play" and control the defense.

We turn to the language of the agreements and find it ambiguous, permitting either of these interpretations. Bolduc grounds his claim on the language of the Letter Agreement,

-23-

specifically its provision that Bolduc "<u>shall</u> be entitled to defend such claim, to compromise it or settle it." (emphasis added)  The Letter Agreement provides:

> In the event that any claim is made against the Crowes or either one of them . . . respecting such payments to be made to the Crowes, or if such payments are otherwise enjoined, trusteed, attached or delayed for any reason whatsoever by any such person, the Crowes shall immediately notify Bolduc, in writing, of any such claim, and shall tender the entire defense of such claim to Bolduc, who thereupon shall be entitled to defend such claim, to compromise it or settle it, in his sole judgment, as he may deem appropriate, and at his sole cost and expense, but without affecting Bolduc's obligation hereunder.  No settlement, except with the agreement of the Crowes, shall relieve the undersigned of his obligation to make the substitute payment.  In all respects, the Crowes shall fully cooperate in the defense and settlement of any such claim, provided that all cost and expense thereof is paid or provided for by Bolduc.

Our inquiry does not stop with the Letter Agreement.  To determine contract ambiguity, courts look to the entirety of the contract.  <u>Guilford</u>, 746 A.2d at 915.  Under Maine law, "in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purposes, and in the course of the same transaction will be considered and construed together, since they are, in the eyes of the law, one contract or instrument."  <u>Hilltop Cmty. Sports Ctr., Inc.</u> v. <u>Hoffman</u>, 755 A.2d 1058, 1062 (Me. 2000) (quoting <u>Kandlis</u> v. <u>Huotari</u>, 678 A.2d 41, 43 (Me. 1996)).  Our inquiry encompasses the Agreement which was executed as part of the same transaction.  The Agreement provides, in Paragraph 6:

-24-

      <u>Defense</u>.  The parties acknowledge the possibility that creditors of Crowe Rope may commence litigation including involuntary bankruptcy proceedings against Crowe Rope or Crowe.  Crowe agrees to cooperate with Bolduc in connection with the defense of such actions as and to the extent requested by Bolduc, provided Bolduc makes satisfactory provision for all costs including legal fees incurred by Crowe in connection with such proceedings.  Bolduc agrees that absent such direction and funding, Crowe shall not be required to defend any pending or future civil actions, administrative proceedings or future bankruptcy proceedings, it being the intention of Crowe to cease all involvement with the affairs of Crowe Rope.  Bolduc acknowledges that there are several creditor lawsuits now pending against Crowe Rope and agrees that Crowe shall have no obligation to defend the same.

The third and fourth sentences of Paragraph 6 of the Agreement, read in conjunction with the Letter Agreement, render the contract ambiguous.  Under Bolduc's reading, the Paragraph simply amounts to a statement that Crowe was not required to defend an action against himself.  At any time, any defendant has the option of doing nothing.  It is unclear, therefore, why either Bolduc or Crowe should feel compelled to "agree" to it.  It is reasonable to read the language of Paragraph 6 as establishing instead an arrangement whereby Bolduc would pay for the defense of any action, and Crowe would not be required to participate unless his costs were reimbursed.  The Magistrate Judge did not err in finding the contract was ambiguous.  In doing so, he gave expression to the entirety of the agreement, as directed by Maine law.

B.  Sufficiency of the Evidence as to Defense Cost Obligation

The evidence at trial permitted the jury to find as it did.  When a written agreement is ambiguous, "the factfinder may entertain extrinsic evidence casting light upon the intention of the parties with respect to the meaning of the unclear language."  Hilltop, 755 A.2d at 1063 (internal citations omitted).  Crowe testified that Bolduc had promised to indemnify him against any suits.  Keach and Tselikis both testified that the intent of the agreements was that Bolduc would be responsible for the costs of defending any suit brought against Crowe.  A reasonable jury could have concluded that the agreement imposed an obligation on Bolduc to pay Crowe's defense costs.

The business logic of the arrangement also supported the jury verdict that the ambiguous language should be read in Crowe's favor.  Since the deal was structured by Bolduc so that he only acquired assets and not the liabilities of Crowe Rope to trade debtors, it was likely those creditors who were owed substantial debts would sue, as did Achille Bayart.  It was also likely that Crowe, not Bolduc, would be the defendant.  Crowe thus had a strong interest to try to protect against both defense costs and a judgment against him.  If Bolduc had intended not to provide any protection as to defense costs, there would have been no need for any of the convoluted language as to defense, nor would there have been a need for the notice provision.  If "doing nothing" as to

defense was truly an option reserved by Bolduc, he needed no language at all in an agreement. As to the indemnity of the annuity, Bolduc could simply have inserted language to the effect that: (1) Bolduc agreed to pay any judgment against Crowe (up to the amount of the annuity), but not defense costs, and would pay the indemnity if, and only if, Crowe gave Bolduc immediate notice of the claim made and provided Bolduc the opportunity to assume the defense; and (2) if Bolduc called on Crowe to cooperate with the defense assumed by Bolduc, then Bolduc would pay only Crowe's costs of cooperation (including attorneys' fees).

On the question of obligation to pay defense costs, the jury might have concluded in Bolduc's favor, but was not compelled to do so by the evidence. The jury's reading was permissible.

C. Breach of Notice Provision

Bolduc's second argument is that even if he did have such an obligation, no reasonable jury could have concluded that Crowe did not materially breach the immediate written notice provision of the Letter Agreement by waiting five months to notify Bolduc of the Achille Bayart action. Crowe concedes that notice was not immediate. The question is whether the breach was material.

Under Maine law, a material breach is "a non-performance of a duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." Jenkins, Inc. v. Walsh Bros., Inc., 776 A.2d 1229, 1234 (Me. 2001)

-27-

(internal quotations omitted). Time of performance is only one element in the determination of whether belated performance constitutes a breach. Associated Builders, Inc. v. Coggins, 722 A.2d 1278, 1280 (Me. 1999). Maine follows the Restatement (Second) of Contracts in considering five factors as significant in determining if a failure is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform . . . will suffer forfeiture;
> (d) the likelihood that the party failing to perform . . . will cure his failure . . .;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Id. at 1280 n.1 (quoting Restatement (Second) of Contracts § 241 (1981)).

Bolduc asserts that he was prejudiced by the delay, specifically by his inability to hire legal counsel of his own choosing, to formulate a defense strategy, to assert affirmative defenses, to formulate answers to interrogatories, and to decide on a jury trial. Bolduc testified at trial that he might have preferred to settle the case in May, before any legal costs had been incurred. But Bolduc's asserted prejudice must be evaluated in context. As the trial judge reminded the jury, they were not to "even consider Mr. Bolduc's affirmative defense -- and therefore this whole issue of material breach -- unless [they] first [found]

-28-

that Mr. Bolduc was obligated to reimburse Mr. Crowe for some or all of the costs of the Achille Bayart lawsuit." Thus, materiality must be measured against the options available to Bolduc once he was responsible for defense costs: (1) not to defend and to pay a default judgment in the sum of $132,287.00 plus double damages sought by Achille Bayart; (2) to settle the case; or (3) to have Crowe defend and have Bolduc reimburse Crowe for his incurred costs.

Bolduc presented no evidence at trial that his interests were materially compromised by the choices made by the BSS&N lawyers; indeed, contrasting evidence was presented that Bolduc's counsel had complimented the BSS&N lawyers on their defense. No complaints or suggestions about how the case was handled were made by Bolduc, either at the time of the Achille Bayart suit or in retrospect. Bolduc's lawyers apparently even insisted that the suit be defended.

At the time Crowe sought to tender his defense, the only actions which had been taken were responding to the original complaint, issuing interrogatories, and filing motions to dismiss and to stay discovery. No answer had been filed to an amended complaint received from Achille Bayart. Moreover, according to Crowe's lawyers, the limited discovery time remaining after notification (less than two months) was unimportant because they felt that the case required little discovery. Few if any

irrevocable decisions about the course of litigation had been made, and those that had were not subsequently objected to by Bolduc after his notification.

Nor did Bolduc demonstrate that his ability to settle the Achille Bayart action was in any way compromised by the litigation strategy of Crowe's counsel.  Crowe's counsel testified to passing on to Bolduc all settlement offers, including a general indication by Achille Bayart that the suit could be settled for a percentage of the amount sought in the complaint.  Bolduc's counsel rejected this settlement offer, insisting on an offer of no more than the nominal sum of $10,000.00, of which half would be paid by Crowe. Achille Bayart also made a settlement demand directly to Bolduc; this too was refused.  A reasonable jury could easily conclude that Bolduc failed to demonstrate the materiality of the breach as a result of Crowe's belated notification.

IV.

The jury verdict is **<u>affirmed</u>**.  Costs are awarded to Crowe.