2000 ME 31

**GUILFORD TRANSPORTATION INDUSTRIES**

v.

**PUBLIC UTILITIES COMMISSION.**

Supreme Judicial Court of Maine.

Argued Dec. 7, 1999.

Decided Feb. 24, 2000.

Gordon H.S. Scott (orally), P. Andrew Hamilton, Eaton, Peabody, Bradford & Veague, P.A., Augusta, for appellant.

Lisa C. Fink (orally), Joanne B. Steneck, Public Utilities Commission, Augusta, for appellees.

William D. Hewitt (orally), Catherine R. Connors, Pierce. Atwood, Portland, for Central Maine Power.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CALKINS, J.

[¶ 1] Guilford Transportation Industries (Guilford) appeals from a summary judgment issued by the Public Utilities Commission (PUC) in a contract dispute between Guilford and Central Maine Power Company (CMP). The PUC held that the license agreement between CMP and Guilford gives CMP the right to cross Guilford's land with fiber optic cable. Guilford contends that the PUC misinterpreted the license agreement and that it does not cover fiber optic cable. We vacate the judgment and remand the matter to the PUC for further proceedings.

[¶ 2] In 1992, Guilford and CMP entered into a master license agreement which was intended to be a consolidation of various agreements whereby Guilford granted CMP licenses to maintain and use "occupations" and "appurtenances" over, across, along, and under land belonging to Guilford and its affiliated railroads. The license agreement provides that CMP has the right to request that additional "appurtenances" be installed in or over Guilford's land and that Guilford is required to grant the request unless Guilford's engineering officer determines that the installation would interfere with rail operations. In 1997, Guilford refused CMP's request to cross Guilford's land in Scarborough with fiber optic cable. CMP requested the PUC to resolve this dispute.

[¶ 3] The PUC is authorized to act in this case by 35–A M.R.S.A. § 2311 (Supp. 1999) and by the agreement between the parties to submit such disputes to the PUC. The relevant portion of section 2311 states:

[I]f a railroad company and a telephone or electric utility enter into an agreement involving a utility crossing of railroad property and that agreement or

some other agreement provides that the commission shall resolve disputes arising under the original agreement, the commission may resolve those disputes. The license agreement provides:

If [Guilford] denies the request [for additional appurtenances] as presented by [CMP] or does not respond within said 45 day period, [CMP] may submit the issue to the Maine Public Utilities Commission for resolution after giving [Guilford] at least 30 days notice of its intent to do so.

[¶ 4] The dispute between the parties centers on whether the license agreement allows CMP to cross Guilford's premises with fiber optic cable. The parties filed summary judgment motions before the PUC, and both argued that the license agreement is unambiguous. The PUC found that the license agreement unambiguously grants CMP the right to cross Guilford's land with fiber optic cable or wire,[1] and Guilford appealed that judgment to this court.[2]

## I. STANDARD OF REVIEW

[¶ 5] The threshold issue before us is the standard of review. If this were an appeal from the Superior Court on summary judgment, we would independently review the record to ascertain that summary judgment was appropriate, *see Kezer v. Mark Stimson Associates*, 1999 ME 184, ¶ 11, 742 A.2d 898, 902, and we would review questions of law de novo, *see Francis v. Pleasant Point Passamaquoddy Hous. Auth.*, 1999 ME 164, ¶ 5, 740 A.2d 575, 577.

[¶ 6] When we review decisions of the PUC, however, "we limit our review to determining whether the agency's conclusions are unreasonable, unjust or un-

lawful in light of the record." *Pine Tree Tel. & Tel. Co. v. Public Util. Comm'n*, 634 A.2d 1302, 1304 (Me.1993) (affirming a PUC order requiring a telephone company to reduce its revenues). "We do not attempt to second-guess the Commission on matters falling within its realm of expertise." *Millinocket Water Co. v. Maine Pub. Util. Comm'n*, 515 A.2d 749, 752 (Me. 1986) (affirming the PUC's calculation of cost of equity).

[¶ 7] Both the PUC and CMP argue that the decision of the PUC in this case is entitled to deference because implicit in the Legislature's grant of authority to the PUC to resolve this dispute is an acknowledgement that the PUC will use its expertise and superior knowledge of the utility industries in judging the matter. Guilford, on the other hand, argues that deference is granted the PUC in ratemaking, utility finance, costs of service and other topics within its particular expertise, but this case is simply a contract dispute and does not involve the PUC's expertise.

[¶ 8] The federal courts have grappled with the standard of review when an administrative agency interprets a contract. The Court of Appeals for the District of Columbia holds that, when reviewing a federal regulatory agency's interpretation of a contract, courts should determine first if the contract is ambiguous or unambiguous, giving no deference to the agency's determination in this regard. *See Cajun Elec. Power Coop., Inc. v. F.E.R.C.*, 924 F.2d 1132, 1135–36 (D.C.Cir.1991). If the contract is unambiguous, the court interprets the contract, giving no deference to the agency; but if the contract is ambiguous, deference is given to the agency's construction of the contract. *Id.*

[¶ 9] The *Cajun Electric* court based its conclusion, in large part, on

---

1. One commissioner dissented on the ground that the license agreement was not free from ambiguity and that extrinsic evidence should be considered in order to determine the intentions of the parties when they entered into the agreement.

2. "An appeal from a final decision of the commission may be taken to the Law Court on questions of law in the same manner as an appeal taken from a judgment of the Superior Court in a civil action." 35–A M.R.S.A. § 1320 (1988).

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) in which the Supreme Court ruled that a court could not substitute its construction of an ambiguous statute administered by an agency when the agency's interpretation was reasonable, *See id.* at 843–44, 104 S.Ct. 2778. The two-part test announced in *Chevron* requires a court, when reviewing an agency's interpretation of a statute it administers, to determine first if the intent of Congress is clear from the statute. If the intent is clear, "that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If, however, the statute is ambiguous, a court's review is limited to determining whether the agency's interpretation is a reasonable one. *Id.* at 843–44, 104 S.Ct. 2778.

[¶ 10] The *Cajun Electric* court also relied upon *National Fuel Gas Supply Corp. v. F.E.R.C.,* 811 F.2d 1563 (D.C.Cir.1987), in which it held that, for the standard of review analysis, there is no difference between construing a statute and construing a contract.[3] Other circuits have concluded that when the legal issue decided by the agency is an issue in which the courts have particular competence, there is no reason for the court to defer to the agency. *See Maloley v. R.J. O'Brien & Assoc., Inc.,* 819

F.2d 1435 (8th Cir.1987) (reviewing de novo whether reparations claims before the Commodity Futures Trading Commission were barred by the statute of limitations).

[¶ 11] We have utilized an analysis similar to the two-part *Chevron* inquiry when reviewing an agency's interpretation of a statute it administers.[4] If the statute is plain, we give effect to the unambiguous intent of the Legislature. *See National Indus. Constrs., Inc. v. Superintendent of Ins.,* 655 A.2d 342, 345 (Me.1995) (vacating agency's interpretation of statute); *Central Maine Power Co. v. Public Util. Comm'n,* 436 A.2d 880, 885 (Me.1981) (deferring to PUC's statutory interpretation "must yield to the fundamental approach of determining the legislative intent, particularly as it is manifest in the language of the statute itself"); *State v. York Util.,* 142 Me. 40, 45 A.2d 634 (1946) (holding agency's longstanding interpretation of the statute does not overcome the clear meaning of the statute). If the statute is ambiguous, however, we review whether the agency's construction is reasonable. *See Berube v. Rust Eng'g,* 668 A.2d 875, 877 (Me.1995) (upholding Workers' Compensation Commission's reasonable interpretation of ambiguous workers' compensation statute).

---

**3.** In setting forth its reasons for deferring to the agency, the *National Fuel* court stated that Congress's grant of authority to the agency to resolve the contract dispute indicated "that the agency's interpretation typically *will* be enhanced by technical knowledge." *Id.* at 1570 (emphasis supplied). Furthermore, the interpretation of the agreement "will be influenced by the agency's expertise in the technical language of that field and by its greater knowledge of industry conditions and practices, including its more comprehensive experience with the kinds of disputes and negotiations that generally produce such an agreement." *Id.* The court went on to state that even when the agency was not making policy but searching "for the parties' contractual intent, that search nonetheless profits from familiarity with the field of enterprise to which the contract pertains."

*Id.* (quoting *Kansas Cities v. F .E.R.C.,* 723 F.2d 82, 87 (D.C.Cir.1983)).

**4.** We do not defer to an agency's interpretation of a statute or legal doctrine when that statute or doctrine is beyond that agency's expertise. *See LeBlanc v. United Eng'rs Constructors Inc.,* 584 A.2d 675, 677 (Me.1991) (holding that the Workers' Compensation Commission is not entitled to deference in its determination of the jurisdictional requirements of the federal constitution); *Dorr v. Maine Maritime Academy,* 670 A.2d 930, 932 (Me.1996) (refusing to give deference to the Workers' Compensation Commission's interpretation of a federal statute); *Van Houten v. Harco Const. Inc.,* 655 A.2d 331, 333 (Me. 1995) (reviewing independently the agency's decision that an employer was not collaterally estopped from relitigating an issue).

[¶ 12] When we review an agency's construction of a contract, it is logical to apply the same methodology utilized when an agency interprets a statute which it administers. The contract in this case is analogous to a statute administered by the PUC. The Legislature's grant of authority to the PUC to resolve the contract dispute implies that it presumed that the PUC's expertise in utility matters would provide a more informed resolution. Furthermore, the fact that the parties in this case explicitly agreed to have the PUC resolve the dispute suggests that the parties themselves believed that a decisionmaker with specialized knowledge was preferable.

[¶ 13] Applying the same analysis that we would if this were an instance of statutory interpretation, we first ascertain whether the contract is ambiguous or unambiguous, and in making that determination we do not defer to the agency's characterization. If we decide that the contract is unambiguous, we then interpret it. The interpretation of an unambiguous contract is a question of law. *See Century Homes, Inc. v. Plaisted,* 412 A.2d 389, 391 (Me.1980). If the contract is ambiguous, its meaning is a question of fact for the factfinder, and extrinsic evidence can be admitted to show the intention of the parties. *See Portland Valve, Inc. v. Rockwood Sys. Corp.,* 460 A.2d 1383, 1387 (Me.1983). Therefore, if we determine that this contract is ambiguous, we will remand the case to the PUC. *See Cajun Electric,* 924 F.2d at 1137.

## II. AMBIGUOUS OR UNAMBIGUOUS CONTRACT

[¶ 14] "Contract language is ambiguous when it is reasonably susceptible of different interpretations." *Portland Valve,* 460 A.2d at 1387. Both parties argue that the license agreement is unambiguous, and both parties have set forth reasonable, but contradictory, interpretations of the agreement.

[¶ 15] The portion of the license agreement at issue is the definition of "appurtenances." The agreement provides that CMP has the right to request that appurtenances be installed in or over Guilford's land and that Guilford must grant the request unless Guilford's engineering officer determines that the installation would interfere with rail operations. "Appurtenances" are defined in the license agreement as "pipes, poles, wires and other equipment." CMP argues that "appurtenances" unambiguously includes fiber optic wires or cables and that "wires" is not limited to wires that carry electric current. Guilford contends that "wires" refers only to strands of metal capable of carrying electric current, and, because fiber optic cable or wire is made of glass and does not carry electric current, the term "wires" cannot mean fiber optic wire.

[¶ 16] We interpret language in a contract by its "generally prevailing meaning." RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(A) (1981). Both parties have supplied the court with numerous dictionary definitions of "wire." Dictionaries support Guilford's position that wire is made of metal. *See, e.g.,* RANDOM HOUSE UNABRIDGED DICTIONARY 2080–81 (2d ed.1993) ("1. a slender, stringlike piece or filament of relatively rigid or flexible *metal*" (emphasis added)); AMERICAN HERITAGE DICTIONARY 2048 (1992) ("1. A usually pliable metallic strand or rod made in many lengths ... used chiefly for structural support or to conduct electricity.") There are dictionary definitions, however, that support CMP's position that "wire" includes communication cable. *See, e.g.,* CHAMBERS SCIENCE AND TECHNOLOGY DICTIONARY 972 (1988) ("(*Telecomm.*) A continuous connection through a system, particularly a telephone exchange, whether automatic or manual)"; OXFORD AMERICAN DICTIONARY 798 (1980) ("2, a cable used to carry telephone or telegraph messages.") We have used the term "fiber wire" to refer to fiber optics. *See A.A.R.P. v. Public Util. Comm'n,* 678 A.2d 1025, 1029 (Me.1996).

[¶ 17] There appear to be "generally prevailing meanings" of "wire" that would support the meaning urged by Guilford and the meaning urged by CMP. We conclude that the contract term "wires" is susceptible to differing, but reasonable, interpretations.

[¶ 18] We look at the entirety of the contract to see if this apparent ambiguity is resolved elsewhere in the document. *See T–M Oil Co., Inc. v. Pasquale,* 388 A.2d 82, 86 (Me.1978) (viewing the entire lease to determine if the ambiguity in one paragraph could be resolved). CMP finds support for its argument in another part of the license agreement, paragraph nine, which requires it to remedy any interference with the railroad that results from appurtenances "which consist of electrical power or communication wires and equipment."[5] Thus, CMP contends, "appurtenances" include communication wires, and fiber optic wires or cables are communication wires. Guilford counters this argument by contending that paragraph nine refers only to CMP's communication wires used to communicate between a control center and a switch. Guilford's interpretation of paragraph nine, however, is not evident from the four corners of the license agreement, and CMP's interpretation, while helpful to its position, is not so persuasive as to be determinative.

[¶ 19] Guilford supports its argument, that the parties never intended to include fiber optic cable in "appurtenances," by reference to the fee schedule attached to the license agreement. The fee schedule is based on voltage, and for transverse crossings of appurtenances that carry between zero and 750 volts, the annual fee is $75. Guilford argues that because fiber optic cable does not have an electrical charge, the fee schedule demonstrates that

the parties could not have intended the agreement to cover fiber optic cable. CMP argues in response that because the fee schedule includes zero volts, the parties intended that wires with no electric current are included within the definition of "appurtenances." The fee schedule lends support to Guilford's argument because it seems that if the parties had anticipated extensive fiber optic crossings Guilford would have insisted on more of a fee. On the other hand, the fee schedule can be seen as a boost to CMP's argument because it would appear that the parties anticipated at least some wires with zero voltage.

[¶ 20] The contract dispute boils down to two basic contentions: (1) CMP's argument that if the parties had intended to exclude fiber optic cable they would have done so explicitly and nothing in the agreement limits "appurtenances" to conduits of electricity; and (2) Guilford's argument that at the time the parties entered into the license agreement, CMP was only an electric utility and was not engaged in telecommunications, and therefore, the parties could only have intended "appurtenances" to mean conduits integral to the business of an electric utility.

[¶ 21] We conclude that an examination of the entire document does not resolve the ambiguity in the terms "appurtenances" and "wires" and does not resolve whether it was the intention of the parties to include fiber optics within the license. Although both parties argued before the PUC and this Court that the agreement was unambiguous and neither contended that they have extrinsic evidence to submit to a factfinder, it is apparent from Guilford's statement of material facts filed with the PUC that extrinsic evidence exists.[6]

---

5. Paragraph 9 states:
   9. *COMMUNICATION OR INDUCTED INTERFERENCE.* For those Appurtenances which consist of electrical power or communication wires and equipment, Licensee shall promptly remedy any inductive interference with railroad operations growing

out of, or resulting from, the presence of such Appurtenances.

6. In its opinion, the PUC stated that it would not consider paragraphs four and five of Guilford's statement of material facts because they referred to matters outside the four corners of

In addition, the briefs filed with this Court from both Guilford and CMP contain references to the history of dealings between the parties on the fiber optic issue and the impact of proposed legislation on their negotiation of the master license agreement. Because the license agreement is ambiguous, its interpretation is a matter of fact, and we must remand to the factfinder.

The entry is:

Judgment vacated. Case remanded to the PUC for further proceedings consistent with this opinion.

the agreement. Specifically, paragraphs four and five, and the affidavit to which they refer, describe the history of dealings between CMP and Guilford concerning fiber optic crossings.