MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2018 ME 128
Docket:        Cum-17-430
Argued:        June 12, 2018
Decided:       August 28, 2018
Revised:       October 11, 2018; July 11, 2019

Panel:         SAUFLEY, C.J., and MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Concurrence:   JABAR, MEAD, and HJELM, JJ.
Concurrence:   SAUFLEY, C.J., and GORMAN and HUMPHREY, JJ.

BOARD OF OVERSEERS OF THE BAR

v.

GARY M. PROLMAN

PER CURIAM

[¶1]  The Board of Overseers of the Bar appeals from the judgment of a single justice of the Supreme Judicial Court (*Alexander, J.*) concluding that Gary M. Prolman violated the Maine Rules of Professional Conduct and the attorney's oath, 4 M.R.S. § 806 (2017), and suspending him from the practice of law for six months.  The Board argues that the court abused its discretion by imposing a six-month suspension without considering and applying the disciplinary framework set out in the American Bar Association's Standards for Imposing Lawyer Sanctions (Am. Bar Ass'n 1992) (ABA Sanction Standards).[1]

---

[1]  To avoid confusion between the ABA Standards for Imposing Lawyer Sanctions and the ABA Model Rules for Disciplinary Enforcement, both of which are referred to in these opinions, we will

2

Although we are evenly split in determining the basis of the error, we unanimously agree that the judgment must be vacated and the matter remanded for a redetermination of the sanction.[2]

## I. BACKGROUND

A.    Factual Findings

[¶2]  The court made the following factual findings, which are supported by the record.  *See Bd. of Overseers of the Bar v. Brown*, 623 A.2d 1268, 1270 (Me. 1993).

[¶3]  In June 2014, as a result of his guilty plea to, and resulting conviction of, federal charges of conspiracy to launder money and aiding and abetting, 18 U.S.C.S. §§ 1956(a)(1), (h) 1957(2) (LEXIS through Pub. L. No. 115-231), Prolman was suspended indefinitely from the practice of law in Maine. Following his guilty plea, Prolman received a sentence of twenty-four months' imprisonment and twenty-four months' supervised release.  In November 2015, the Board filed a motion seeking further disciplinary action against Prolman, and Prolman responded with a motion seeking limitation or termination of his suspension.  After a hearing on those motions in February

refer to the Standards for Imposing Lawyer Sanctions as the "ABA Sanction Standards" and the Model Rules for Disciplinary Enforcement as the "ABA Sanction Rules."

  [2]  The separate analyses are set out in the concurring opinions.

2016, a single justice of the Supreme Judicial Court (*Alexander, J.*) issued a decision concluding that Prolman had violated M.R. Prof. Conduct 8.4(a)-(d) but nonetheless ordering the termination of Prolman's suspension as of July 1, 2016, thereby reinstating him to the practice of law. [3]  Pursuant to that order, Prolman's reinstatement and continued active practice was conditioned upon his compliance with the terms and conditions of his federal supervised release. The Board did not appeal from that order.

[¶4]  In late 2016, the woman who later filed the complaint in this matter contacted Prolman and asked him to represent her in two separate matters. One of those matters involved an outstanding warrant from Florida for the woman's arrest after she was charged with theft.  Prolman agreed to represent the woman for a flat fee and successfully resolved the matter.  Prolman also agreed to assist her in having the period of probation arising from a felony drug conviction terminate early.  In March 2017, Prolman arranged for early termination of her probation, effective in June 2017, provided that his client complied with terms of her probation until that time.  Prolman received another flat fee to represent her in that matter.

---

[3] In the order appealed from here, the court incorporated by reference the facts contained in the March 7, 2016, disciplinary order.

4

[¶5]   Beyond the two matters for which Prolman was retained, the woman also discussed with Prolman whether he could assist her with a third matter.   At the time, criminal charges for sex trafficking women, including Prolman's client, were pending against an individual in Massachusetts.  Because the client was concerned about the risks associated with testifying against that individual, and because she wanted to put her history of sex trafficking victimization behind her, the client asked Prolman to assist her in arranging to avoid testifying in that matter.

[¶6]   At the time the client retained Prolman, she was living with a boyfriend.   The boyfriend was controlling and abusive; the client gave her boyfriend the money she earned from her job, and in return, he paid her expenses, including the flat fees paid to Prolman for his representation.   The boyfriend also paid for and controlled the client's cell phone.   On at least two occasions in early 2017, the boyfriend assaulted the client.   Although law enforcement officials had indications that the assaults had occurred, the assaults were not prosecuted because the client indicated that she would refuse to testify against her boyfriend.

[¶7]   On the evening of March 26, 2017, the client's boyfriend savagely assaulted her at their apartment.  In addition to causing other injuries, he broke

bones in her face and attempted to strangle her, leaving marks on her throat. The client fled to another residence and the police arrested the boyfriend.

[¶8]  On March 27, 2017, law enforcement authorities anticipated that the boyfriend would be bailed and would return to the apartment that he and the client shared.  As such, they believed that it was necessary that the client promptly find other accommodations where her boyfriend would not have access to her.  At the time, the client had no money and no one in the community to whom she could turn for assistance.

[¶9]  On March 27, Prolman was in Florida, preparing to return from a ten-day vacation.  Prolman and the client spoke by phone on several occasions. During these calls, she apparently described the assault and informed Prolman of her need to find safe accommodations.  Prolman also spoke with the deputy who was the client's diversion supervision officer.  Prolman indicated to the deputy that there was an apartment above his law office in Saco where the client could stay.  The impression Prolman conveyed to the deputy was that the apartment was an otherwise vacant apartment where the client could stay, by herself, until more permanent living arrangements could be found.

[¶10]  In fact, the apartment above Prolman's law office was Prolman's residence and had three bedrooms and one bathroom.  The first bedroom,

6

located next to the only bathroom on that floor, was occupied by Prolman. The second bedroom was occupied by another individual who was not then present. The third bedroom was where the client would stay. Because the deputy did not know that Prolman lived in the apartment and because, from the deputy's perspective, no other living arrangement was available and a living arrangement for the client was urgently needed, the deputy agreed to place the client in the apartment above Prolman's law office. The deputy arranged for the client to travel to the apartment where, by prior arrangement, Prolman's office assistant had left directions for the client to get into the apartment.

[¶11] Prolman arrived home from Florida late in the evening of March 27 or very early in the morning on March 28. During the day of March 28, Prolman purchased a cell phone for the client that was added, as a second phone, to Prolman's cell phone account. The cell phone was intended to provide the client with a means of communication that was not known to or accessible by her abusive boyfriend. Prolman also assisted his client in obtaining a job as a waitress at a local restaurant.

[¶12] On March 29, Prolman and the client met with law enforcement officials and probation officers to discuss the client's probation status and the prosecution of her abusive boyfriend. At the meeting, the fact that the client

was living in an apartment above Prolman's law office was discussed, but at no point did Prolman or his client indicate that Prolman was also residing at the apartment. Had she learned that Prolman was living at the apartment, the client's diversion officer would have acted to terminate that living arrangement. Because Prolman's conditions of supervised release prohibited him from associating with felons, except for providing service as an attorney, Prolman's federal probation officer also would have objected to Prolman allowing the client, who had a felony drug conviction, to live with him.

[¶13] When he arranged for his client to live in his apartment, Prolman was aware of his client's social history, history of abuse, submissiveness to men, and vulnerability to abusive physical and sexual relationships. Despite this knowledge, on more than one occasion while Prolman and his client were residing at his apartment between March 29 and April 9, 2017, Prolman approached his client seeking sexual gratification and engaged in sexual acts with her. The client regarded Prolman's sexual acts as "gross." Although she did not consent, she also did not communicate her objection to Prolman's sexual acts, simply submitting to what Prolman demanded as she had done in past relationships with men who had taken advantage of her vulnerability.

8

[¶14]  Pursuant to the client's intensive supervision as part of the diversion program, the deputy was in regular contact with the client while she was residing at Prolman's apartment.  At no time while the client was residing in Prolman's apartment did the deputy receive any indication that there was reason to be concerned about the relationship between Prolman and the client.  Consistent with the client's past practice of minimizing or not disclosing problems she had with men abusing or taking advantage of her during the course of her probation supervision, the client did not disclose Prolman's actions until she moved out of the apartment.

[¶15]  On April 10, the client, with the assistance of her employer, acquired a vehicle.  That day, Prolman prepared dinner for his client, which they shared with glasses of wine.  The meal was festive, and its purpose was to celebrate the client's increasing independence.  Late that evening, Prolman approached the client in her bedroom and attempted to initiate sexual relations with her.  She refused, and he left the room.  The next day, April 11, the client moved out of the apartment.  Prolman and the client did not have in-person contact again.

[¶16]  When Prolman discovered that the client had moved out of his apartment, he contacted her through text messages and asked, in

friendly-sounding words, where she was and whether she was "alright." The client responded to those text messages, indicating that she wanted to terminate their attorney/client relationship and would handle her pending probation matter on her own. Approximately two weeks later, by a motion dated April 26, 2017, Prolman sought and was granted leave to withdraw from representing the client. The motion to withdraw asserted that the client had been in compliance with the terms of her probation, and that the hearing for early termination of her probation—to which the State had already agreed— could proceed without further appearance of counsel.

[¶17] During the time his client was residing at the apartment, Prolman consumed and provided his client with wine. Prolman's conditions of supervised release prohibited his use or possession of alcoholic beverages, and a violation of those conditions also would be a violation of the March 17, 2016, disciplinary order requiring compliance with the terms of his supervised release.[4]

---

[4] Although Prolman denied any sexual contact with the client, the court found that the client's testimony was more credible than his. The court based this credibility determination on several factors, including, inter alia, the following:

(1) Prolman testified that on the evening of April 9, he and his client had a "blow up", during which he accused his client of—and she admitted to—using drugs while residing at the apartment, and he told her that he was terminating the attorney/client relationship. However, the court found it unlikely that the celebratory dinner on April 10, which included the consumption of

10

## B.    Procedural History

[¶18]  On May 26, 2017, the Board filed a petition for Prolman's interim suspension pursuant to Maine Bar Rule 24, alleging that Prolman violated Maine Rules of Professional Conduct 1.5(a), 1.7(a)(2), 1.16(a)(1), 2.1, 3.4(c), 8.4(a), (d), and the attorney's oath, 4 M.R.S. § 806.[5]  The court held a hearing on

---

wine, would have occurred if that "blow up" and termination of the attorney/client relationship had indeed occurred.

(2) Prolman testified that the seventeen-day delay—from April 9 to April 26—in filing his motion to withdraw was due to the fact that his office assistant was on vacation and the motion therefore could not be typed and properly prepared.  However, the office assistant testified that she did not leave for vacation until Wednesday, April 12, meaning she would have been available on two business days, Monday, April 10, and Tuesday, April 11, if Prolman had wanted her to promptly file the motion to withdraw.

(3) Text messages between Prolman and the client, beginning on Tuesday, April 11, include statements by Prolman that he would likely not have made if the "blow up" on April 9 had indeed occurred.  Moreover, a text message on April 13 indicated that it was the client, not Prolman, who terminated the attorney/client relationship.  It was only after Prolman received this text message from the client that he filed the motion to withdraw.

[5]  Rule 1.5(a) provides, in pertinent part, that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses."  M.R. Prof. Conduct 1.5(a).

Rule 1.7(a)(2) provides that, with several exceptions not applicable here, "a lawyer shall not represent a client if the representation involves a concurrent conflict-of-interest," which exists when "there is a significant risk that the representation of one or more clients would be materially limited by . . . a personal interest of the lawyer."  M.R. Prof. Conduct 1.7(a)(2).

Rule 1.16(a)(1) provides that, with one exception not applicable here, "a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if . . . the representation will result in a violation of the rules of professional conduct or other law."  M.R. Prof. Conduct 1.16(a)(1).

Rule 2.1 provides, in pertinent part, that "[i]n representing a client, a lawyer shall exercise independent professional judgment and render candid advice."  M.R. Prof. Conduct 2.1.

the matter beginning on August 30, and evidence was heard over the course of three days. During closing argument, the Board argued that the court should consider the ABA Sanction Standards in imposing Prolman's sanction, and specifically referenced Standards 4.3, 5.2, 6.1, and 6.3.

[¶19] On September 14, 2017, the court issued the order that is the subject of this appeal, making numerous findings of fact and concluding that the Board had proved, by a preponderance of the evidence, that Prolman violated M.R. Prof. Conduct 1.7(a)(2), 2.1, 8.4(a), 8.4(d), and the attorney's oath, 4 M.R.S. § 806. *See* M. Bar R. 14(b)(4). The court also stated that "[d]uring closing argument, Bar counsel argued that violations of Rules of Professional Conduct not indicated in the initial petition, specifically violations of Rules of Professional Conduct 4.3, 5.2, 6.1, and 6.3(1), were also being asserted."

---

Rule 3.4(c) provides that "[a] lawyer shall not . . . knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." M.R. Prof. Conduct 3.4(c).

Rule 8.4(a) provides, in pertinent part, that "[i]t is professional misconduct for a lawyer to . . . violate or attempt to violate any provision of either the Maine Rules of Professional Conduct or the Maine Bar Rules," while Rule 8.4(d) provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." M.R. Prof. Conduct 8.4(a), (d).

The attorney's oath requires an attorney, upon admission to the bar, to swear or affirm, in pertinent part, that he or she will "conduct [him or herself] in the office of an attorney within the courts according to the best of [his or her] knowledge and discretion, and with all good fidelity . . . as to [his or her] clients." 4 M.R.S. § 806 (2017).

12

However, the court concluded that the Board had not proved violations of those rules.

C.      Sanctions

[¶20]  After finding the violations, the court considered what would be the appropriate sanction for Prolman's violations.   It observed that, as articulated in comment 12 to Rule 1.7, "Maine has not adopted the ABA Model Rules [of Professional Conduct's] categorical prohibition on an attorney forming a sexual relationship with an existing client . . . ."  M.R. Prof. Conduct 1.7 cmt. (12).  For that reason, as well as others, the court concluded that opinions from other jurisdictions addressing attorney discipline for sexual activity with clients—which the Board had submitted to the court—were "not particularly helpful in determining the appropriate sanction" for Prolman.

[¶21]  The court further observed that he was required to apply Maine Bar Rule 21(c) in determining Prolman's sanction.  Rule 21(c) provides,

> **(c)      Factors to be Considered in Imposing Sanctions.**  In imposing a sanction after a finding of lawyer misconduct, the Single Justice, the Court, or the Grievance Commission panel shall consider the following factors, as enumerated in the ABA Standards for Imposing Lawyer Sanctions:
>
> (1)      whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;

(2)     whether the lawyer acted intentionally, knowingly, or negligently;

(3)     the amount of the actual or potential injury caused by the lawyer's misconduct; and

(4)     the existence of any aggravating or mitigating factors.

[¶22]  Pursuant to Rule 21(c)(1), the court concluded that "by initiating a sexual relationship with his client and by providing her alcoholic beverages to consume, Prolman violated duties owed to his client and the legal system." In determining Prolman's state of mind pursuant to Rule 21(c)(2), the court reasoned that "Prolman's actions in his treatment of his client and in his failure to disclose to her support team that she would be living with him was negligent and reckless, though probably not so well thought out or planned in advance sufficiently to be considered intentional."  Addressing the injury caused by Prolman's misconduct pursuant to Rule 21(c)(3), the court concluded that "[i]mposing oneself sexually on a nonconsenting, vulnerable, and submissive person inevitably causes psychological injury to the person subject to such advances and caused psychological injury to the client in this case."

[¶23]  Finally, in determining aggravating and mitigating factors for Prolman's sanction pursuant to Rule 21(c)(4), the court included as mitigating factors the facts that (1) "Prolman's professional services were successful in

14

achieving the client's objectives in the two cases for which he was retained"; (2) he got "involved in trying to help his client reestablish her independence after her necessary separation from her dangerously abusive boyfriend"; and (3) "[h]e arranged for her to get a new cell phone, and he arranged for her to get a job." The court's recitation of aggravating factors included the facts that (1) Prolman's "effort to help his client became misguided when he had her move into his apartment and then initiated the sexual relationship that took advantage of the living arrangement and his client's vulnerability"; (2) "[t]he injury caused by Prolman's conduct essentially continued and confirmed the pattern of men victimizing and oppressing the client that she had endured for most of her life;" and (3) he "placed his client at risk by providing her alcoholic beverages that could have caused her probation to be revoked."

[¶24] After considering the factors expressly contained in Rule 21(c), the court imposed a six-month suspension from the practice of law, effective November 1, 2017. The Board's timely appeal followed. *See* M.R. App. P. 2B(c)(1); M. Bar R. 13(g)(4).

## II. DISPOSITION OF APPEAL

[¶25] We all agree that the sanctions imposed were simply insufficient and represent an abuse of discretion. Three of us would conclude that the ABA

Sanction Standards have been engrafted onto the Maine Rules of Professional Conduct, and that the court erred as a matter of law and therefore abused his discretion in failing to apply those Standards. Three of us would look to those Standards for guidance but would not determine that they have been wholly engrafted into the Maine Rules.

[¶26] Unanimously, we vacate the judgment and remand the proceedings to the court for the imposition of a sanction that reflects the serious behavior of the attorney and that, at a minimum, would require Prolman to apply for readmission upon demonstration of a thorough understanding of the ethical obligations of a Maine attorney.

[¶27] Because we are evenly divided on the analysis, we do not today announce new law on the interpretation of Maine Bar Rule 21(c). All of us, however, concur in the result of vacating the six-month suspension. The entry is:

> Sanction vacated. Remanded to the court for a
> de novo imposition of sanctions consistent with
> paragraph 26 of this opinion.

16

JABAR, J., with whom MEAD and HJELM, JJ., join, concurring.

[¶28]  The Board contends that Maine Bar Rule 21(c) incorporates the framework and methodology set forth in the ABA Sanction Standards, and that the court therefore erred in imposing a six-month suspension on Prolman without considering and applying those Standards.  The Board further asserts that, upon proper application of the ABA Sanction Standards to the facts of this case, a more severe sanction was warranted.  We agree, and for the following reasons, we would conclude that the court abused his discretion by failing to apply the ABA Sanction Standards when imposing Prolman's sanction.

## I.  STANDARD OF REVIEW

[¶29]  We interpret the Maine Bar Rules de novo as a matter of law, and we "review for clear error the findings of fact that determine the applicability of the rule." *Bd. of Overseers of the Bar v. Warren*, 2011 ME 124, ¶ 25, 34 A.3d 1103.  The propriety of a sanction imposed by a single justice is reviewed for an abuse of discretion. *In re Dineen*, 380 A.2d 603, 605 (Me. 1977). "Review for an abuse of discretion involves resolution of three questions: (1) are factual findings, if any, supported by the record according to the clear error standard; (2) did the court understand the law applicable to its exercise of discretion; and (3) given all the facts and applying the appropriate law, was the court's

weighing of the applicable facts and choices within the bounds of reasonableness." *Pettinelli v. Yost*, 2007 ME 121, ¶ 11, 930 A.2d 1074. An abuse of discretion occurs when an error of law causes a court not to consider a factor that it is legally permitted to consider, *State v. Svay*, 2003 ME 93, ¶ 11, 828 A.2d 790, or "when a material factor deserving significant weight is ignored," *West Point-Pepperell, Inc. v. State Tax Assessor*, 1997 ME 58, ¶ 7, 691 A.2d 1211 (quotation marks omitted).

## II. THE FRAMEWORK AND METHODOLOGY OF THE ABA SANCTION STANDARDS

[¶30] A review of the disciplinary framework and methodology set forth in the ABA Sanction Standards is helpful in understanding this issue. The ABA Sanction Standards, first adopted by the American Bar Association in 1986 and then amended in 1992, comprises a comprehensive scheme that sets forth clearly developed standards for the imposition of attorney discipline. ABA Sanction Standards § I(A). The ABA Sanction Standards were "developed after an examination of all reported lawyer discipline cases from 1980 to June, 1984," with the stated intent of articulating a "theoretical framework for

use in imposing sanctions." *Id.* § I(B). To that end, the framework of the ABA

Sanction Standards requires a disciplinary body to consider four questions:

(1)    What ethical duty did the lawyer violate? (A duty to a client, the public, the legal system, or the profession?)

(2)    What was the lawyer's mental state? (Did the lawyer act intentionally, knowingly, or negligently?)

(3)    What was the extent of the actual or potential injury caused by the lawyer's misconduct? (Was there a serious or potentially serious injury?) and

(4)    Are there any aggravating or mitigating circumstances?

*Id.* § II.

[¶31]    In order to facilitate this determination, the ABA Sanction

Standards are organized into various sub-parts. The analysis regarding an

appropriate sanction begins with Standard 3.0, which largely mirrors both the

theoretical framework provided above and the language of Rule 21(c).[6]  *See*

---

[6] Standard 3.0 of the ABA Sanction Standards provides,

3.0 Generally

In imposing a sanction after a finding of lawyer misconduct, a court shall consider the following factors:

(1) the duty violated;

(2) the lawyer's mental state;

(3) the potential or actual injury caused by the lawyer's misconduct; and

(4) the existence of aggravating or mitigating factors.

ABA Sanction Standards § III(C)(3.0). The ABA Sanction Standards then include provisions that govern varying kinds of violations of rules of professional conduct. For instance, Standard 4.0 governs "Violations of Duties Owed to Clients," Standard 5.0 governs "Violations of Duties Owed to the Public," and Standard 6.0 governs "Violations of Duties Owed to the Legal System." *Id.* § III(C)(4.0)-(6.0).

[¶32] For the limited purpose of illustrating the framework of the ABA Sanction Standards—and using an example that in no way relates to the conduct involved in this matter—consider the case of a hypothetical attorney found in violation of a rule of professional conduct proscribing the misappropriation of a client's funds. There, a disciplinary body would begin a sanction determination by reviewing Standard 4.1, "Failure to Preserve the Client's Property." *Id.* § III(C)(4.1). The disciplinary body would then—based upon its factual findings that supported its finding of lawyer misconduct—determine the attorney's state of mind and the injury caused to the client by the attorney's misappropriation of the client's funds. Where the attorney acted intentionally or caused injury or potential injury to the client, Standard 4.11

---

Sanction Standards for Imposing Lawyer Sanctions § III(C)(3.0) (Am. Bar Ass'n 1992).

provides for a presumptive sanction of disbarment. *Id.* § III(C)(4.11). Conversely, where the attorney acted negligently and caused little to no actual or potential injury to the client, Standard 4.14 provides that the presumptive sanction is an admonition. *Id.* § III(C)(4.14).

[¶33] After making this presumptive sanction determination, the disciplinary body would then consider the aggravating and mitigating factors enumerated in Standard 9.2 and 9.3, respectively. *Id.* § III(C)(9.2)-(9.3). Standard 9.22 lists eleven aggravating factors that a disciplinary body may consider after determining the attorney's presumptive sanction, and Standard 9.32 lists eleven mitigating factors for consideration. *Id.* § III(C)(9.22), (9.32). Standard 9.4 lists factors that cannot be considered in aggravation or mitigation. *Id.* § III(C)(9.4).

[¶34] Accordingly, where the presumptive sanction for lawyer misconduct is a suspension, but there is a considerable imbalance between an extensive number of aggravating factors and few, if any, mitigating factors, a disciplinary body would be justified in increasing a lawyer's sanction to disbarment. Conversely, where the presumptive sanction is a suspension but the mitigating factors significantly outweigh the aggravating factors, the

disciplinary body would be justified in lowering a lawyer's sanction to a reprimand.

### III. WHETHER MAINE BAR RULE 21(C) INCORPORATES THE ABA SANCTION STANDARDS

[¶35]  This case presents to us an issue of first impression: whether the imposition of attorney discipline pursuant to Maine Bar Rule 21(c)—having repealed and replaced former Maine Bar Rule 7.1(e)(3)(C) (Tower 2014), effective July 1, 2015, *see* M. Bar R. 21 Reporter's Notes to 2015 amend.; M. Bar R. 33—requires the application of the particular disciplinary framework and methodology of the ABA Sanction Standards as explained above.  The Board argues that Rule 21(c) "expressly incorporates" that framework and methodology, while Prolman contends that Maine "has not adopted in *toto* the ABA [Sanction Standards], and, in fact, has explicitly rejected portions of those Standards."  Prolman argues that "Maine Bar Rule 21 actually paraphrases, and more specifically defines, the four factors specifically referenced in Standard 3.0 of the ABA [Sanction Standards]."  According to Prolman, "[b]y specifically addressing each of the four factors set forth in Maine Bar Rule 21(c) and Standard 3.0 [of the ABA Sanction Standards], the [court] acted well within [its] discretion and committed no error."

[¶36]  As stated in the Court's Per Curiam opinion, Court's Opinion ¶ 21, Rule 21(c) provides that when imposing a sanction after a finding of lawyer misconduct, a single justice must consider the four factors specified in paragraphs 1-4 "*as enumerated in*" the ABA Sanction Standards.  M. Bar. R. 21(c) (emphasis added).  To answer the question of whether Rule 21(c) incorporates the framework and methodology of the ABA Sanction Standards, therefore, we must determine the meaning that should be attached to the term "as enumerated in."

[¶37]  When interpreting a bar rule, as when interpreting a statute, we first look to the rule's plain language and consider that language in the context of the entire disciplinary scheme.  *See Bailey v. Bd. of Bar Examiners*, 2014 ME 58, ¶¶ 18-21, 90 A.3d 1137; *Warren*, 2011 ME 124, ¶ 32, 34 A.3d 1103; *Darling's v. Ford Motor Co.*, 1998 ME 232, ¶ 5, 719 A.2d 111.  In so doing, we are mindful that "[n]othing in a [rule] may be treated as surplusage if a reasonable construction applying meaning and force is otherwise possible." *State v. Tozier*, 2015 ME 57, ¶ 6, 115 A.3d 1240 (quotation marks omitted).  If the language of the rule is unambiguous, we apply its plain meaning.  *See Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 13, 107 A.3d 621; *Warren*, 2011 ME 124, ¶ 32, 34 A.3d 1103.  Language is ambiguous when it is reasonably susceptible to different

interpretations. *Guilford Transp. Indus. v. Pub. Utils. Comm'n*, 2000 ME 31, ¶ 14, 746 A.2d 910. If a rule is ambiguous, we consider its meaning in light of its history and the intent behind the promulgation of that rule. *See Bailey*, 2014 ME 58, ¶¶ 19, 21, 90 A.3d 1137; *MaineToday Media, Inc. v. State*, 2013 ME 100, ¶ 6, 82 A.3d 104.

A.    Plain Language

[¶38] Here, the language at issue comprises two clauses: an independent clause, "the Single Justice shall consider the following factors"; followed by a dependent clause, separated by a comma, "as enumerated in the ABA Standards for Imposing Lawyer Sanctions."[7]  M. Bar R. 21(c).  Due to the structure of this sentence, it is unclear whether the dependent clause modifies the word "consider"—which, as the Board contends, would signify that the factors must be applied in the *manner in which* they are applied pursuant to the ABA Sanction Standards, thereby requiring the court to apply the ABA Sanction Standards framework in its entirety—or whether the dependent clause modifies the word "factors" which, as Prolman argues, would indicate that the

---

[7]  Maine Bar Rule 21(c)'s prefatory language actually contains three clauses, as the language at issue is prefaced by an additional dependent clause "In imposing a sanction after a finding of lawyer misconduct . . . ."  That clause is not germane to our analysis here because neither party disputes that a sanction may be imposed only "*after* a finding of lawyer misconduct." M. Bar R. 21(c) (emphasis added).

factors enumerated are *also* listed in the ABA Sanction Standards. Considered in isolation, the term "as enumerated in" in Rule 21(c) is ambiguous, as it can reasonably receive more than one construction, potentially resulting in the imposition of disparate attorney discipline. *See Guilford Transp. Indus.*, 2000 ME 31, ¶ 14, 746 A.2d 910.

[¶39] However, when reviewing the entire disciplinary scheme created by the Maine Bar Rules, *see Darling's*, 1998 ME 232, ¶ 5, 719 A.2d 111, it is evident that the term "as enumerated in" in Rule 21(c) serves to incorporate the entire disciplinary framework set forth in the ABA Sanction Standards. Maine Bar Rule 13(c)(2)(A), which governs Bar Counsel's authority to refer attorneys to the Alternatives to Discipline Program, provides that a factor for consideration in that referral process is "whether the *presumptive sanction* under the ABA [Sanction] Standards for the alleged misconduct is likely to be no more severe than reprimand or admonition." (Emphasis added.) Because, as explained above, *supra* ¶¶ 32-33, the determination of an attorney's "presumptive sanction" constitutes one portion of the analysis that a disciplinary body must make pursuant to the ABA Sanction Standards framework, the Maine Bar Rules clearly contemplate that "the Single Justice, the

Court, or the Grievance Commission panel" must apply that entire framework when imposing attorney discipline pursuant to Rule 21(c).

[¶40]   Indeed, to construe Rule 21(c) as Prolman urges would leave Rule 13(c)(2)(A) with little effect, as his construction would not require a disciplinary body to make a "presumptive sanction" pursuant to Rule 21(c) and Bar Counsel, in turn, would not have the "presumptive sanction" on which to base its attorney referral determination.  M. Bar R. 13(c)(2)(A); *see Tozier*, 2015 ME 57, ¶ 6, 115 A.3d 1240 ("Nothing in a [rule] may be treated as surplusage if a reasonable construction applying meaning and force is otherwise possible." (quotation marks omitted)).  Accordingly, we would conclude that Rule 21(c) is not ambiguous in the context of the Maine Bar Rules' disciplinary scheme, and that its plain language requires "the Single Justice, the Court, or the Grievance Commission panel" to consider and apply the entire ABA Sanction Standards framework when imposing a sanction after a finding of lawyer misconduct.

B.    Ambiguity, Relevant History, and Policy Considerations

[¶41]   Even if Rule 21(c) were ambiguous, however, its history further compels our conclusion that the Rule requires the entire ABA Sanction Standards framework to be applied.  *See MaineToday Media, Inc.*, 2013 ME 100, ¶ 6, 82 A.3d 104.  The Maine Bar Rules were abrogated [repealed and replaced]

in July 2015.  M. Bar R. 33.  The current Bar Rules were adopted after the Board of Overseers of the Bar established the Committee to Review Maine's Disciplinary Enforcement Rules (the Committee), which compared the former Maine Bar Rules with the ABA's Model Rules for lawyer disciplinary enforcement (Am. Bar Ass'n 2002) (ABA Model Rules) to create the current Maine Bar Rules.  M. Bar. R. at 19 Reporter's Notes to 2015 amend.  As the Reporter's Notes to Rule 21 provide, "Rule 21(c) is based on former Maine Rule 7.1(e)(3)(C) but also incorporates language from [ABA] Model Rule 10(C) that specifically references the [ABA Sanction Standards]."  M. Bar R. 21 Reporter's Notes to 2015 amend.

[¶42]  Both the abrogated Maine Bar Rule 7.1(e)(3)(C) (Tower 2014) and ABA Model Rule 10(C) contain the same factors—in nearly identical language— as those enumerated in Rule 21(c),[8] but ABA Model Rule 10(C) additionally

---

[8] Abrogated Maine Bar Rule 7.1(e)(3)(C) provides, in relevant part,

> If the disciplinary panel finds that misconduct subject to sanction under these rules has occurred . . . , the panel shall either issue a public reprimand to the respondent attorney or, upon a finding of probable cause for suspension or disbarment, shall direct Bar Counsel to commence an attorney discipline action by filing an information pursuant to Rule 7.2(b).  In determining the appropriate sanction, the panel shall consider the following factors among others: (i) whether the attorney has violated a duty owed to a client, to the public, to the legal system, or to the profession; (ii) whether the attorney acted intentionally, knowingly, or negligently; (iii) the amount of actual or potential injury caused by the attorney's misconduct; and (iv) the existence of any aggravating or mitigating factors.

M. Bar R. 7.1(e)(3)(C) (Tower 2014).  Similarly, ABA Model Rule 10(C) provides,

provides that the disciplinary body must consider those factors "as enumerated in" the ABA Sanction Standards. The only substantive difference, therefore, between Maine's former rule for imposing sanctions, Maine Bar Rule 7.1(e)(3)(C) (Tower 2014), and the new rule, Maine Bar Rule 21(c), is the inclusion of the language contained in ABA Model Rule 10(C) that "specifically references the [ABA Sanction Standards]." M. Bar R. 21 Reporter's Notes, to 2015 amend.; *see* M. Bar R. 21(c).

[¶43] The effect of this discrete modification is illuminated by the interrelationship between ABA Model Rule 10(C) and Standard 3.0 of the ABA Sanction Standards. As pertinent case law from other jurisdictions demonstrates, both Standard 3.0 of the ABA Sanction Standards and ABA Model Rule 10(C)—by virtue of its reference to Standard 3.0 of the ABA Sanction

---

C. Factors to be Considered in Imposing Sanctions. In imposing a sanction after a finding of lawyer misconduct, the court or board shall consider the following factors, *as enumerated in the ABA Standards for Imposing Lawyer Sanctions*.

    (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;

    (2) whether the lawyer acted intentionally, knowingly, or negligently;

    (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and

    (4) the existence of any aggravating or mitigating factors.

(Emphasis added.)

Standards—require a disciplinary body to impose a sanction pursuant to the *entire* ABA Sanction Standards framework. *See, e.g.*, *V.I. Bar v. Brusch*, 49 V.I. 409, 414 n.6, 420-22 (V.I. 2008) (acknowledging that ABA Model Rule 10(C) incorporated the ABA Sanction Standards and applying those Standards' framework and methodology); *In re Disciplinary Proceeding Against Perez-Pena*, 168 P.3d 408, 414-16 (Wash. 2007) (stating that the ABA Sanction Standards govern attorney sanctions in Washington and beginning its sanction determination with a review of Standard 3.0 before applying the ABA Sanction Standards' framework and methodology); *Bd. of Prof'l Responsibility v. Beduhn*, 402 P.3d 950, 967-78 (Wyo. 2017) (reviewing attorney discipline pursuant to Wyoming Rule of Disciplinary Procedure 15(b)(3)(D)—which, like Rule 21(c), contains the "as enumerated in" language from ABA Model Rule 10(C)—and applying the ABA Sanction Standards' framework and methodology).

[¶44]   As noted above, Prolman contends that Rule 21(c) cannot be interpreted to require the application of the ABA Sanction Standards because "the Maine Bar Rules specifically chose to retain a variety of aspects of the existing Maine Bar Rules, while rejecting other portions of the ABA [Sanction Standards]." This argument is misleading because it fails to distinguish the ABA Sanction Standards from the ABA Model Rules. Although the Committee

developed the current Maine Bar Rules—later promulgated by the Supreme Judicial Court—by comparing the abrogated Maine Bar Rules with the ABA Model Rules, M. Bar R. Reporter's Notes to 2015 amend., and the current Maine Bar Rules do differ from the ABA Model Rules,[9] this does not mean that the Committee rejected the ABA Sanction Standards. Rather, as the Board correctly asserts, the ABA Sanction Standards and the ABA Model Rules "are discrete texts with distinct purposes," and the new Maine Bar Rules' rejection of some portions of the ABA Model Rules cannot be read as a rejection of the ABA Sanction Standards. This is especially so where, as here, the new Maine Bar Rules expressly included in Rule 21(c) a provision from the ABA Model Rules that incorporates the framework set forth in the ABA Sanction Standards.

[¶45] Finally, we observe that, as a matter of policy, construing Rule 21(c) to incorporate the ABA Sanction Standards framework promotes our objective of "provid[ing] a clear and consistent articulation of what constitutes appropriate professional standards." *Bd. of Overseers of the Bar v. Rodway*, 470 A.2d 790, 791 (Me. 1984). As we reasoned in *Rodway*, "Disciplinary proceedings for alleged violations must be administered with an

---

[9] For example, Maine Bar Rule 14(a)(4) provides that the Board's burden of proof in establishing its case is a preponderance of the evidence standard, while ABA Model Rule 18(C) provides for a clear and convincing standard. Model Rules for Lawyer Disciplinary Enforcement 18(c) (Am. Bar Ass'n 2002).

even hand." *Id.* We agree with the Board that, absent the clarifying aid of the ABA Sanction Standards framework for imposing discipline, Rule 21(c) is "indeterminately vague," as it provides a list of four factors for consideration but offers no guidance either as to how those factors relate to one another or how they should be applied in response to the broad array of attorney misconduct that a disciplinary body is faced with addressing. By requiring that attorney discipline be imposed pursuant to the ABA Sanction Standards framework, we would ensure that attorneys subject to such discipline receive "fair and consistent treatment" for violations of the Maine Rules of Professional Conduct. *Rodway*, 470 A.2d at 791.

## IV. APPLICATION TO THIS CASE

[¶46] Accordingly, we would conclude that Rule 21(c) incorporates the framework and methodology of the ABA Sanction Standards, thereby requiring that framework to be explicitly applied after a finding of lawyer misconduct. We would therefore conclude that the court abused its discretion by imposing a sanction on Prolman without applying the ABA Sanction Standards to

Prolman's violations of the Maine Rules of Professional Conduct.[10]  *See Pettinelli*, 2007 ME 121, ¶ 11, 930 A.2d 1074.

[¶47]  As the record demonstrates, after the Board made arguments pursuant to the ABA Sanction Standards in its closing argument, the court mistook the Board's reference to those Standards to constitute an argument for separate violations of the Maine Rules of Professional Conduct not alleged in its initial petition.  Thus, it is clear that the court did not consider the ABA Sanction Standards in imposing Prolman's sanction.  Although the court did consider the four factors set out in Rule 21(c), it did so only in isolation, without consideration of the comprehensive framework and methodology that serve to give those factors context and meaning.  For example, the court did not refer to the discrete ABA Sanction Standards that correlate with Prolman's violations of the Maine Rules of Professional Conduct, nor did the court apply its findings regarding Prolman's mental state and the injury to Prolman's client to determine a presumptive sanction as provided by each ABA Sanction Standard.

---

[10]  We agree completely with the other concurrence's characterization of Prolman's actions as being "abhorrent to the profession" and with its determination that a six-month suspension for such conduct—requiring no demonstration of rehabilitation in order to return to the practice of law—is "plainly and compellingly insufficient."  Concurring Opinion ¶ 54.  For this reason, we emphasize that even if the clear effect of the Court's 2015 amendment of Rule 21(c) did not incorporate the ABA Sanction Standards, we would emphatically agree that the court nonetheless abused his discretion because the "sanction imposed is wholly insufficient to protect the public," Concurring Opinion ¶ 54, and therefore lies well beyond the "bounds of reasonableness."  *Pettinelli v. Yost*, 2007 ME 121, ¶ 11, 930 A.2d 1074.

Indeed, although the hearing evidence supports the court's finding that Prolman's failure to disclose the client's living situation was negligent or reckless, the court did not address Prolman's state of mind as it pertained to his initiation of a sexual relationship with his client, which was the basis for the court's conclusion that Prolman violated M.R. Prof. Conduct 1.7(a)(2).

[¶48]  Nor did the court, after determining Prolman's presumptive sanction, consult the aggravating and mitigating factors enumerated in the ABA Sanction Standards to determine if a modification of the presumptive sanction was appropriate.  This is made clear by the fact that the following aggravating factors *could have* been applicable in this case: (1) Standard 9.22(a), for "prior disciplinary offenses," because Prolman had already been suspended for two years after pleading guilty to federal money laundering charges; (2) Standard 9.22(b), for a "dishonest or selfish motive," because attempting to achieve sexual gratification from a nonconsenting client is undoubtedly motivated by selfishness; (3) Standard 9.22(d), for "multiple offenses," because the court found that Prolman approached his client seeking sexual gratification and engaged in sexual acts with her "on more than one occasion"; (4) Standard 9.22(g), for "refusal to acknowledge wrongful nature of conduct," because Prolman denied that the sexual acts occurred; (5) Standard 9.22(i), for

"substantial experience in the practice of law" (the court incorporated by reference the facts contained in Prolman's March 7, 2016, disciplinary order, including the finding that Prolman was admitted to the Maine Bar in 1991 and has since "primarily engaged in a solo practice with a focus on criminal defense work"; and (6) Standard 9.22(k), for "illegal conduct," because the court found that "Prolman consumed and provided his client wine," in violation of both his federal supervised release and the client's probation, and because the court found that Prolman imposed himself sexually on a "nonconsenting" individual. ABA Sanction Standards §§ III(C), 9.22(a), (b), (d), (g), (i), (k).

[¶49]   Because it did not follow the framework of the ABA Sanction Standards, the court did not consider those factors, instead considering two aggravating factors not listed in the ABA Sanction Standards and, with respect to the aggravating factors enumerated in those Standards, considered only the "client's vulnerability."  *See id.* § III(C)(9.22)(h).

[¶50]   We would therefore hold that Maine Bar Rule 21(c) incorporates the ABA Sanction Standards, and we would vacate the judgment and remand this matter to the court to impose a sanction using the methodology and framework set out in those ABA Sanction Standards.

———————————

34

SAUFLEY, C.J., with whom GORMAN and HUMPHREY, JJ., join, concurring.

[¶51] We agree that the sanctions are insufficient, but we would conclude that there is no need to incorporate the ABA's lengthy and detailed "Standards for Imposing Lawyer Sanctions" into the Maine Bar Rules as a matter of law.[11] Although an adjudicator should consult that extended discussion when it is relevant to a particular sanction decision, the requirement that an adjudication must track that lengthy and detailed guidance in minute detail in order to impose any sanction would create an unnecessarily cumbersome process.

[¶52] In the matter before us, we can and should be entirely straightforward. The court's factual determinations are all fully supported by the record. The court correctly understood the applicable law, and it understood that the court's role was to apply the sanctions framework set out in Maine Bar Rule 21(c).

[¶53] The only error in the court's analysis was in exceeding its discretion by imposing a sanction that minimizes both the conduct that was

---

[11] The pertinent section of the ABA Sanction Standards published by the ABA consists of nine pages of criteria that a court should consider in imposing sanctions. ABA Sanction Standards § III(C). The standards include five major "parts," each of which is further divided into sub-parts and even sub-sub-parts. *Id*.

articulately detailed in the court's findings and Attorney Prolman's criminal and disciplinary history. Perhaps because the Law Court so rarely concludes that a trial court has acted outside the bounds of its discretion, our colleagues would conclude that the abuse of discretion must have generated from an error of law. We disagree.

[¶54] All that needs to be said is this: When an attorney has been sentenced to federal prison for using his legal talents to commit serious crimes, and upon reinstatement to the Bar engages in behavior that is abhorrent to the profession, including taking sexual advantage of a client he knew to have been the victim of sex trafficking, a six-month suspension, requiring no demonstration of rehabilitation in order to return to the practice of law, is plainly and compellingly insufficient.

[¶55] The history of Prolman's actions *as an attorney* is particularly important in this case. Prolman is apparently a very skilled and persuasive attorney. He used those considerable talents to engage in a course of conduct through which he laundered money for his clients in the drug trafficking business. For that behavior, he was sentenced to two years in federal prison, followed by two years of supervision. His license to practice law was

suspended indefinitely. After he was released from prison, the court lifted that suspension and allowed Prolman to return to the practice of law.

[¶56] Within a year after recovering his privilege to practice law, Prolman engaged in the conduct that brings this appeal before us. Again, he was able to successfully assist his client in several matters, and again, he engaged in completely unacceptable behavior. As our colleagues note today, among other things, the court found that

(1) Prolman's "effort to help his client became misguided when he had her move into his apartment and then initiated the sexual relationship that took advantage of the living arrangement and his client's vulnerability,"

(2) "The injury caused by Prolman's conduct essentially continued and confirmed the pattern of men victimizing and oppressing the client that she had endured for most of her life," and

(3) Prolman "placed his client at risk by providing her alcoholic beverages that could have caused her probation to be revoked."

On these facts, the court imposed only a six-month suspension, following which Prolman will again return, unrestricted, to the practice of law.

[¶57] The error in the court's selection of a sanction does not lie in the failure to identify and analyze a lengthier list of factors to consider. The error lies in the sanction's brevity and its failure to require a substantial improvement in Prolman's understanding of the trust that the public reposes

in an attorney. At base, the brief six-month suspension substantially minimizes the seriousness of the conduct in which Prolman was found to have engaged.

[¶58] The abuse-of-discretion standard is deferential, but it is not an impenetrable barrier to appellate relief. *See generally* Andrew M. Mead, *Abuse of Discretion: Maine's Application of a Malleable Appellate Standard*, 57 Me. L. Rev. 519 (2005); *see also In re Jamara R.*, 2005 ME 45, ¶ 17, 870 A.2d 112 (explaining that in reviewing for an abuse of discretion we consider "whether the court's factual findings are supported by the record; . . . whether the court understood the law applicable to the exercise of its discretion; . . . [and] whether . . . the court's weighing of the applicable facts was within the bounds of reasonableness"). We should say clearly that it is an abuse of discretion to impose a six-month period of suspension on an attorney who has sex with a vulnerable client who he knows has been the victim of sex trafficking and domestic abuse. We should say that with even more certainty here, where the attorney who committed these wrongs had recently been reinstated to the Bar following a two-year suspension arising out of felony convictions.

[¶59] We would conclude that the court committed no error of fact or law, but that the sanction imposed is wholly insufficient to protect the public and is therefore an abuse of discretion.

38

Aria Eee, Esq. (orally), and J. Scott Davis, Esq., Board of Overseers of the Bar, Augusta, for appellant Board of Overseers of the Bar

James M. Bowie, Esq. (orally), Thompson Bowie & Hatch LLC, Portland, for appellee Gary M. Prolman

Maine Supreme Judicial Court docket number Bar-14-12
FOR CLERK REFERENCE ONLY