STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
LOCATION: Portland
DOCKET NO. BCD-CV-2020-00028

GENERAL HOLDINGS, INC, and
PRESERVATION HOLDINGS, LLC,

       Plaintiffs,

     v.

U.S.A. METROPOLITAN TAX CREDIT
FUND II, L.P., U.S.A. INSTITUTIONAL TAX
CREDIT FUND IV, L.P., and EIGHT PENN
PARNTERS, L.P.,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER DENYING DEFENDANT
EIGHT PENN PARTNERS, L.P.'S
MOTION FOR SUMMARY
JUDGMENT**

<u>INTRODUCTION</u>

This suit involves the standing of a general partner which obtained its controlling interest through an auction sale without the consent of the limited partners, to challenge the transfer of limited partner interests.[1] Plaintiff General Holdings, Inc. ("General Holdings"), controlled by Preservation Holdings, LLC, seeks to void and reverse the purported transfer of limited partner interests ("LP interests") by the two Defendant tax credit funds (the "Funds") to Defendant Eight Penn Partners, L.P. ("Eight Penn"). Eight Penn moves for summary judgment under Rule 56 of the Maine Rules of Civil Procedure on the basis that General Holdings lacks standing to assert its claims. For the reasons discussed below, the Court DENIES the motion.

<u>STANDARD OF REVIEW</u>

---

[1] Through its Opposition, General Holdings not only opposes summary judgment for Defendants on the standing issue but seeks summary judgment in its favor on its claims. Ordinarily, "[s]ummary judgment, when appropriate, may be rendered against the moving party." M.R. Civ. P. 56(c). Here, however, through the process described in M.R. Civ. P. 134(b), the parties and the Court agreed the only issue to be explored through Defendants' motion for summary judgment would be standing. Thus, the Court declines to address General Holding's other arguments.

1

Summary judgment is appropriate where the parties' statements of material fact and the portions of the record referenced therein "disclose no genuine issues of material fact and reveal that one party is entitled to judgment as a matter of law." *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 11, 915 A.2d 400. "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quoting *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 8, 13 A.3d 773). The Court must view a party's statements of material fact in the light most favorable to the non-movant and draw all reasonable inferences in favor of the same. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897.

FACTUAL ALLEGATIONS

Pamela Gleichman has established dozens of affordable housing projects by forming limited partnerships for each project, with Gleichman serving as one of two General Partners ("GP") and her wholly owned Maine corporation, Gleichman & Co., Inc.,[2] serving as the other. (Defs.' Supp'g S.M.F. ¶ 1.) The same is true for the four projects relevant to this action (the "Projects"), which she established in the 1990s. (Id.) Gleichman was until March 2014 the sole equity owner of Gleichman & Co., Inc. (Supp'g S.M.F. ¶ 2; Pls.'s Resp. S.M.F. ¶ 2.) Gleichman caused a "Limited Partnership Agreement and Certificate" to be filed with Maine's Secretary of State for each of the Projects—Curwensville Park Associates, Roaring Springs Commons, McConnellsburg Commons, and Patton Terrace Commons. (Supp'g S.M.F. ¶ 3.) Richman Asset Management ("Richman"), a syndication firm which obtained equity to invest in such projects by purchasing limited partnership interests and raised funds using the tax credit funds U.S.A.

---

[2] Gleichman & Co., Inc. changed its name to General Holdings, Inc. in 2014.

Metropolitan Tax Credit Fund, II, L.P. ("MTCF II") and U.S.A. Institutional Tax Credit Fund, IV, L.P. ("ITCF IV"). Using these entities, Richmond raised development funds for each of the Projects. (Supp'g S.M.F. ¶ 4.) MTCF II invested in three of the Projects and ITCF IV invested in the fourth, with Richman executing the Amended and Restated Agreement (a "Partnership Agreement") for each of the limited partnerships and signing as the agent for each investment fund. (Supp'g S.M.F. ¶ 5.)

On May 1, 1995 MTCF II became the Limited Partner ("LP") in two limited partnerships—Roaring Springs Common and McConnellsburg Commons—and in the Patton Terrace Commons limited partnership on July 1, 1995.[3] ITCF IV became the LP of the Curwensville Park Associates limited partnership on June 1, 1996. (Supp'g S.M.F. ¶ 6.) The LP in each of the four projects is defined as being the "Investment Partnership," i.e., MTCF II or ITCF IV. (Supp'g S.M.F. ¶ 7.) The LPs made investments in each of the Projects ranging from $400,000 to $600,000. (Supp'g S.M.F. ¶ 8.)

The Partnership Agreements stated Gleichman and Gleichman & Co, Inc. were the two GPs. (Supp'g S.M.F. ¶ 9.) The GPs signed a Loan Agreement with FmHA, now known as Rural Development, for each Project on behalf of the respective limited partnership. (Opp'g S.M.F. ¶ 1; Defs.' Resp. to Opp'g S.M.F. ¶ 1.) The Patton Terrace, Roaring Springs, and McConnellsburg Commons Agreements contained an additional "General Partners Certification" executed by the two GPs. These agreements stated Gleichman and Gleichman & Co, Inc. were the two GPs. (Supp'g S.M.F. ¶ 10.) The Curwensville Park Agreement identified Gleichman as "Guarantor" and she executed that Agreement in that capacity. (Supp'g S.M.F. ¶ 11.) All four Partnership Agreements, executed in 1995 and 1996, contained a provision in Article VI governing the topic

---

[3] Defendant's S.M.F. incorrectly reads "MTCF IV."

of changes in partners, with the initial subsection (section 6.01) addressing the withdrawal of a GP and providing as follows:

> (a) A General Partner may withdraw from the Partnership or sell, transfer or assign his or its Interest as a General Partner (or a controlling interest in the General Partner) only with the prior Consent of the Investment Partnership, and of the Agency and/or the Lender, if required, and only after being given written approval by the necessary parties as provided in Section 6.02 of the General Partner(s) to be substituted for him or it or to receive all or part of his or its Interest as General Partner.

(Supp'g S.M.F. ¶ 12.) 6.02 requires the consent of the GPs or their successors to admit a successor or additional GP. (Supp'g S.M.F. ¶ 24.)

In 2008, Gleichman executed a Unanimous Consent appointing Rosa Scarcelli, the President and majority interest holder in Stanford Management at that time and today, as Vice President of Gleichman & Co., Inc. and giving her irrevocable authority over the management contracts with each of the Projects, though Gleichman remained the sole director and shareholder of Gleichman & Co., Inc. at that time. (Opp'g S.M.F. ¶ 3; Pls.' Resp. S.M.F. ¶ 3.) By letter dated October 17, 2012 Scarcelli's counsel informed Gleichman's counsel of Scarcelli's intention to acquire certain debt; Scarcelli received no objection prior to the assignment of that debt and security agreement. (Opp'g S.M.F. ¶¶ 4-5.) Gleichman did not oppose the entry of summary judgment in the action seeking recovery under that debt and judgment was entered without opposition. (Opp'g S.M.F. ¶ 6.)

Gleichman changed the name of Gleichman & Co., Inc. to General Holdings in February 2014. (Opp'g S.M.F. ¶ 7.) In March 2014 Preservation Holdings, LLC ("Preservation Holdings"), an entity 100% owned by Scarcelli which she formed to purchase and foreclose creditor claims against her mother, purchased at auction 100% of the stock of General Holdings, giving Scarcelli sole control of the entity. (Supp'g S.M.F. ¶ 19.) By letter dated May 13, 2014 Norman, Hanson &

4

Detroy, LLC provided an opinion to Rural Development on the foreclosure of the shares of General Holdings, though Rural Development received no prior consent. (Opp'g S.M.F. ¶ 8; Defs.' Resp. S.M.F. ¶ 8.)

The auction resulted in a change in ownership of all General Holdings shares as of March 2014 without the separate, written consent of the LPs or of Richman Asset Management. (Supp'g S.M.F. ¶ 20; Pls.' Resp. S.M.F. ¶ 20.) Scarcelli, testifying on behalf of General Holdings, stated she did not disagree with Bower that Richman Asset Management had not provided separate written consent to the 2014 change in control. (Supp'g S.M.F. ¶ 22.)

On February 13, 2018 Pamela Bower of Richman wrote to Gleichman, advising her of the dissolution of MTCF II and ITCF IV and the sale of those entities' interests. (Supp'g S.M.F. ¶ 26.) When she was dealing with Gleichman, Bower believed she was dealing with a GP. (Supp'g S.M.F. ¶ 18; Pls.' Resp. S.M.F. ¶ 18.) Gleichman responded on March 28, 2018 to offer to purchase the LP interests and pay the unpaid minimum distributions and asked which format she should use to submit the offer. (Supp'g S.M.F. ¶ 26.)

On March 14, 2018 Scarcelli's husband Thom Rhoads exchanged e-mails with Raymond Giller, an asset manager at Richman, in which Giller sought additional information on pending litigation between the Gleichman as GP and General Holdings as corporate GP, which was affecting deals and audits. (Opp'g S.M.F. ¶ 10; Defs.' Resp. S.M.F. ¶ 10.) Rhoads stated it was his belief that control of the Projects was no longer at issue in litigation, that Gleichman's economic interests in the Projects had been foreclosed and sold at auction in 2017, and that once the auction results are verified Gleichman will be formally dissociated from all the Projects. (Opp'g S.M.F. ¶ 11.)

Gleichman never voluntarily withdrew as GP from any of the four Limited Partnerships though her economic interests were foreclosed upon no later than April 2018. (Supp'g S.M.F. ¶ 14; Pls.' Resp. S.M.F. ¶ 14.) The foreclosure auction of Gleichman's economic interest in the Projects was upheld by the Memorandum Decision and Judgment in *Pres. Holdings, LLC v. Norberg*, No. 2014 L 50823 (Ill. Cir. Ct. Apr. 26, 2018).[4] Consent for the transfer of the controlling interest was never specifically sought from any of the LPs, from Richman Asset Management, or from Gleichman. (Supp'g S.M.F. ¶ 25.) The LPs under the four Agreements never executed any documents to remove or replace Gleichman as GP, nor did General Holdings obtain separate written consent from the LPs. (Pls.' Resp. S.M.F. ¶¶ 15-16.) Bower testified that a successor or additional, i.e., "new" GP would not be recognized with consent from LPs. (Supp'g S.M.F. ¶ 17; Pls.' Resp. S.M.F. ¶ 17.)

On May 1, 2018 Jennifer Rohr of Richman wrote to Rhoads, asking whether there were any litigation, environmental, or compliance issues relating to Curwensville Park. (Defs.' Resp. S.M.F. ¶ 12.) Rhoads responded on May 7, 2018, indicating Gleichman's personal GP interests had been foreclosed and sold, that Gleichman and Karl Norberg were seeking a declaratory judgment to nullify and void the auction of General Holdings,[5] and that Curwensville Park was a defendant in another action.[6] (Opp'g S.M.F. ¶ 13; Defs.' Resp. S.M.F. ¶ 13.) Richman did not seek further clarification. (Opp'g S.M.F. ¶ 14.)

On August 28, 2018 Roads asked Rohr and Giller if Richman would agree to transfer its LP interests to General Holdings, claiming Gleichman had "withdrawn" as individual GP and that General Holdings "now controls the entire GP interest." (Supp'g S.M.F. ¶ 28; Opp'g S.M.F. ¶ 15.)

---

[4] This Court takes judicial notice that the circuit court's order was affirmed on appeal. *Pres. Holdings, LLC v. Norberg*, 435 Ill. Dec. 391, 139 N.E.3d 62 (2019).
[5] *Gleichman v. Scarcelli*, No. BCDWB-CV-17-11 (Bus. & Consumer Ct. *Murphy, J.*).
[6] *Hillman v. Curwensville Park Associate*, No. BCD-CV-17-55 (Bus. & Consumer Ct. *Murphy, J.*).

Richman did not respond; Bower testified she had never received a specific consent request for any change in GP and that a GP remains as such absent Richman's consent. (Supp'g S.M.F. ¶ 29; Pls.' Resp. S.M.F. ¶ 29; Opp'g S.M.F. ¶ 16.) At least up to July 2, 2018 Gleichman and her entity Gleichman & Company, Inc., were listed as the General Partner for the Projects in the online records of Maine's Secretary of State. (Supp'g S.M.F. ¶ 33.) Prior to December 2018 Gleichman had conversations with Richman in which she expressed her belief that taking over a controlling interest in a corporate GP like General Holdings requires permission. (Defs.' Resp. S.M.F. ¶ 18.)

In the third and fourth quarters of 2018, Eight Penn paid $57,949 and executed numerous documents with MTCF II and ITCF IV purporting to transfer those investment funds' LP interests from Richman to Eight Penn. (Supp'g S.M.F. ¶ 30; Pls.' Resp. S.M.F. ¶ 30.) Richman's practice when transferring LP interests is to leave it to the buyer to obtain all necessary consents. (Opp'g S.M.F. ¶ 19.) Since the purported transfer occurred, ITCF IV, which held the LP interest in the Curwensville Park Associates partnership, has been dissolved, and neither fund wishes to purchase back the LP interests. (Supp'g S.M.F. ¶ 34.) At no point in 2018 did Richman inform anyone at Stanford Management or General Holdings that Richman was involved in negotiations with Gleichman about the sale of LP interests or that any documentation had been executed purporting to transfer those interests. (Opp'g S.M.F. ¶ 17.) On or about February 14, 2019 Eight Penn's counsel wrote to the CPA for Stanford Management seeking copies of the four "tax credit funds"— i.e., the Projects—in which Eight Penn had allegedly purchased LP interests. (Supp'g S.M.F. ¶ 31.) On February 19, 2019 Rhoads wrote to Eight Penn's counsel, stating that Stanford Management would consider the LP interest transfers as "invalid" and confirming he had written in August 2018 on behalf of General Holdings seeking to purchase the LP interests, as explained hereabove. (Supp'g S.M.F. ¶ 32.)

Richman has never taken any action under the procedures set forth in Section 8.13 of the Agreements to seek the removal of General Holdings as a GP in any of the Projects in which Richman has an LP interest. (Opp'g S.M.F. ¶ 20; Defs.' Resp. S.M.F. ¶ 20.) Had the consent of General Holdings been sought prior to any transfer of Richman's LP interests to Eight Penn, General Holdings likely would not have consented because of the prior conduct and insolvency of Karl Norberg and/or Gleichman. (Opp'g S.M.F. ¶ 22.) Scarcelli testified that it was better to have LP interest owned by the Scarcelli/Gleichman family and that they had a practice of purchasing the interests from the original investors to that end. (Defs.' Resp. S.M.F. ¶ 22.)

DISCUSSION

It is undisputed that the Funds contracted to deal with two specific GPs: Gleichman and her entity, General Holdings (f/k/a Gleichman & Co., Inc.). It is also undisputed that under Article VI of the Partnership Agreements, the consent of the Funds, as LPs, and of Richman was required for any GP to withdraw or sell, transfer, or assign that GP's interest or controlling interest in a GP from the partnership, as is written approval by those parties and of the existing GPs of any substitute or additional GP, and that no such affirmative consent or approval was obtained. The issue on summary judgment is both a factual and a legal question: whether General Holdings, now controlled by Preservation Holdings, LLC, has standing as a GP to argue the transfer of the Funds' LP interests to Eight Penn should be voided and reversed for failure to seek its consent prior to the transfer. This question turns on whether the foreclosure of Gleichman's economic interests and subsequent forced sale at auction amounts to a sale or transfer as envisioned in the Partnership Agreements and if so, whether General Holdings automatically ceased being a GP.

The four Partnership Agreements were formed under Maine law and will be construed and enforced in accordance with Maine law. In Maine, a limited partnership agreement is an agreement

8

among partners which "governs relations among the partners and between the partners and the partnership" subject to certain nonwaivable provisions. 31 M.R.S. § 1310(1)-(2). The court must construe the agreement to give "maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements." § 1310(1).

Partnership agreements are construed in accordance with ordinary contract law principles. In the absence of ambiguity, an agreement is interpreted according to the plain meaning of its provisions and extrinsic evidence is not considered. *Green v. Lawrence*, 2005 ME 90, ¶ 7, 877 A.2d 1079. Ambiguity exists where language is reasonably susceptible of multiple interpretations. *Competitive Energy Servs. v. PUC*, 2003 ME 12, ¶ 15, 818 A.2d 1039; *see also Portland Valve, Inc. v. Rockwood Systems Corp.*, 460 A.2d 1383, 1387 (Me. 1983). When the language is ambiguous, it is appropriate for the factfinder to consider extrinsic evidence of the parties' intention. *Hilltop Community Sports Ctr., Inc. v. Hoffman*, 2000 ME 130, ¶ 21, 755 A.2d 1058 ("To aid it in construing the [contractual] agreement, the factfinder may entertain extrinsic evidence casting light upon the intention of the parties with respect to the meaning of the unclear language.") (internal quotations omitted). When interpreting an agreement, the court will view it as a whole and a construal "that would render any particular provision in the contract meaningless should be avoided." *McCarthy v. U.S.I Corp.*, 678 A.2d 48, 52 (Me. 1996).

Every plaintiff "must establish its standing to sue, no matter the causes of action asserted." *Bank of Am., N.A. v. Greenleaf*, 2014 ME 89, ¶ 7, 96 A.3d 700. "At a minimum, '[s]tanding to sue means that the party, at the commencement of the litigation, has sufficient personal stake in the controversy to obtain judicial resolution of that controversy.'" *Mortgage Elec. Reg. Sys. v. Saunders*, 2010 ME 79, ¶ 7,2 A.3d 289, 293-94 (quoting *Halfway House Inc. v. City of Portland*,

670 A.2d 1377, 1379 (Me. 1996)). As discussed below, General Holdings easily satisfies that baseline requirement.

Eight Penn argues that because Scarcelli did not obtain consent as required in Section 6.01 of the Partnership Agreements to obtain a controlling interest in General Holdings, that entity has no standing or authority as GP to challenge the Funds' sale of their LP interests to Eight Penn. Section 6.01 provides that "[a] General Partner may withdraw from the Partnership or sell, transfer or assign his or its Interest as General Partner (or a controlling interest in the General Partner) only with [the relevant prior consents and approvals]." This language is ambiguous, however, because it is susceptible to two reasonable interpretations. On the one hand, Section 6.01 can be construed as applying solely to voluntary transfers, reading "may" as permissive. Pursuant to this reading, Section 6.01 would not apply to the auction sale in this case. That would mean General Holdings remained a GP with standing to pursue this complaint after the forced sale of Gleichman's shares at auction. On the other hand, Section 6.01 can be interpreted to apply to *all* transfers, reading "may" as declarative. Because of the ambiguity, the Court will need extrinsic evidence to discern the intent of Section 6.01. The summary judgment record is insufficient for this level of analysis, and thus there is a genuine dispute of material fact regarding the intent of Section 6.01.

However, even if Section 6.01 were declarative and applied to all transfers, including the foreclosure auction at issue, Preservation Holdings' purchase of Gleichman's shares without Richman's consent would not automatically effectuate General Holdings' disassociation as GP. Under Section 8.13(a) of the Partnership Agreements, Richman, as Investment Partnership, had the right to seek the removal of General Holdings as GP for enumerated reasons, including the perceived violation of any provision of the Agreement. Section 8.13(b) provides a procedure for seeking such removal. Automatic disassociation would render this section meaningless. If

10

Richman believed the involuntary transfer was a violation of Section 6.01, it should have sought General Holdings' removal via the established procedure, but it has not done so. As such, General Holdings remains a GP with relevant standing notwithstanding Section 6.01's applicability.

General Holdings also notes language in loan agreements executed by Gleichman and Gleichman & Co., Inc. as GPs which states that the relevant partnership shall comply with appropriate Rural Development regulations and shall not permit any GP to maintain less than an aggregate of 5 percent financial interest in the organization. (*See* Pls.' Opp'g S.M.F. ¶ 2.) According to General Holdings, this language means that the foreclosure of Gleichman's entire economic interest caused her immediate dissociation. However, this argument is not relevant to the question of standing and this Court will not take up General Holdings' attempt to reach further than the standing issue on summary judgment.

CONCLUSION

Based on the foregoing, the entry will be: Defendants' motion for summary judgment is DENIED.

SO ORDERED.

The Clerk is requested to enter this Order on the Docket, incorporating it by reference pursuant to M.R. Civ. P. 79(a).

Date: **04/01/2022**

_____
Michael A. Duddy, Judge
Business & Consumer Court

Entered on the docket: 04/01/2022